**LAWSON–AVILA CONSTRUCTION, INC., Appellant,**

v.

**Alton STOUTAMIRE and Regina Stoutamire, et al., Appellees.**

No. 04–89–00361–CV.

Court of Appeals of Texas, San Antonio.

June 6, 1990.

Rehearing Denied July 6, 1990.

Sharon E. Callaway, Groce, Locke & Hebdon, San Antonio, for appellant.

Scott M. Bage, Dan Pozza, Daniel J.T. Sciano, Bernard Wm. Fischman, Tinsman & Houser, Wallace T. Jacobs, C.G. House, House & House, Camile Glasscock DuBose, Beckman, Quirk & Fulton, David R. Weiner, San Antonio, for appellees.

Before BUTTS, CHAPA and CARR, JJ.

## OPINION

CHAPA, Justice.

This is an appeal from a jury verdict in favor of the appellees, Alton Stoutamire and Regina Stoutamire, individually and as representatives of the estate of Gregory Paul Stoutamire, deceased, Eric Paul Stoutamire, a minor, individually and as sole legal heir and legal representative of the estate of Gregory Paul Stoutamire, deceased, by and through his guardian of the estate, Larry J. Cromer, and Keith Schoolcraft. The case arises out of an accident on a construction site, which resulted in personal injuries to Keith Schoolcraft and fatal injuries to Gregory Paul Stoutamire. Stoutamire's son and parents brought a wrongful death and survival lawsuit against the appellant general contractor, Lawson–Avila Construction, Inc., the subcontractor, Capital Rentals, Inc., who supplied the crane involved in the accident, and the crane operator, Tommy Bullard, an employee of Capital Rentals. Appellee Schoolcraft sued the same defendants for negligence. The two cases were consolidated for trial. Prior to trial, Stoutamire's son and parents settled with Capital Rentals and Tommy Bullard.

The jury found that appellant was 40 percent negligent and Capital Rentals 60 percent negligent. Eric Stoutamire's estate was awarded $253,061.03; the son was awarded $800,000 in actual damages; the parents were awarded $200,000; and, Keith Schoolcraft was awarded $91,070.98.

In addition, the jury found that both Capital Rentals and appellant were grossly negligent. Exemplary damages in the amount of $1,500,000 were assessed against appellant and $2,000,000 against Capital Rentals, with those damages apportioned at 50 percent to the son, 40 percent to the Stoutamire estate, and 10 percent to Schoolcraft. Lawson–Avila appeals from the judgment.

Appellant Lawson–Avila's Motion For Judgment Non Obstante Veredicto was denied. Appellant's Alternative Motion to Disregard the Jury's Answers was granted in part as to Question No. 7(e) and (g), striking awards to Schoolcraft for $10,000 physical impairment in the future and for $20,000 loss of earnings in the future. Appellant's post-verdict motions to modify the judgment and for new trial were denied.

The issues before us are whether:

1) As a matter of law, appellant owed a legal duty of care to an independent contractor's employees;

2) The trial court erred in failing to submit a question inquiring whether appellant retained the right to control an independent contractor's performance of its work activity sufficient to give rise to a duty to exercise ordinary care in regard to an employee of that independent contractor;

3) The trial court was required to submit an instruction confining the jury's consideration of appellant's duty of care to an independent contractor's employees to such acts or omissions for which appellant owed a duty of care;

4) The "gross negligence" standard upon which Texas allows exemplary damages is unconstitutionally vague and deprives a defendant of its due process rights;

5) A finding of gross negligence or exemplary damages must be based on "clear and convincing evidence;"

6) The evidence was factually insufficient to support a finding of gross negligence against the appellant;

7) The exemplary damages were excessive;

8) There was evidence to support appellee Schoolcraft's award of $10,000 for physical impairment in the future.

## Facts of the Case

Comal Independent School District contracted with Lawson–Avila Construction, Inc., to build Smithson Valley High School. As the general contractor of the project, Lawson–Avila contracted with Palmer Steel Supplies, Inc., to provide the structural steel work. Palmer Steel subcontracted Weedie's Welding & Fabrification to do the erection. Because its crane was not in working order, Weedie's Welding contracted with Capital Rentals, Inc., to provide a crane and an operator to lift the steel to the second story of the building where Weedie's Welding employees were putting in joists and bridging.

Keith Schoolcraft and Greg Stoutamire, both employed as iron workers by Weedie's Welding, were working on the second story of the building. Schoolcraft and Stoutamire were landing the iron joists and putting them in place on the concrete beams as they were lifted by the crane operator, Tommy Bullard. Schoolcraft directed the crane operator where to put the loads of joists by means of hand signals, or "flagging." Approximately 25 to 30 loads of joists were lifted from the initial location of the crane. The crane was later moved to a second location to continue placing the joists on the second story. While the greatest lifting capacity of a crane is over the rear, Bullard set up the crane almost sideways to the building at the second location. While lifting a bundle of bridging angles up to the second story, Schoolcraft realized that the crane was "booming down and off to one side." Schoolcraft signaled the crane operator to stop and then shrugged his shoulders at the operator, in an effort to ask whether the operator should boom down any further because of the instability. Bullard testified that a shrug to him could also have indicated a question as to why he was stopping.

When the operator did not respond, Schoolcraft signaled him to boom down further. When the crane operator did, Schoolcraft saw the outrigger stabilizer on the crane start to rock and realized that he and Stoutamire should get off the beam. Before he or Stoutamire could move more than a few steps, the crane tipped and hit the center beam, causing it to bend and causing the concrete beams, which held it in place, to pull loose from the slab. Schoolcraft and Stoutamire fell about 25 to 30 feet to the ground, along with some joists and the bridging load the crane had

been lifting. Stoutamire was hit by some of the joists and suffered fatal injuries. Schoolcraft sustained two compression fractures of the vertebrae, a broken wrist, and bruised kidneys.

### Duty and Right of Control

In its first point of error, the appellant argues that, as a matter of law, appellant owed no legal duty of care to an independent contractor's employees. "An owner or occupier of land has a duty to use reasonable care to keep the premises under his control in a safe condition." *Redinger v. Living, Inc.*, 689 S.W.2d 415, 417 (Tex. 1985). "A general contractor on a construction site, who is in control of the premises, is charged with the same duty as an owner or occupier." *Id.* "This duty to keep the premises in a safe condition may subject the general contractor to direct liability for negligence in two situations: (1) those arising from a premises defect, (2) those arising from an activity or instrumentality." *Id.* In *Redinger*, the court adopted the rule enunciated in the Restatement (Second) of Torts, which provides:

> One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.

RESTATEMENT (SECOND) OF TORTS § 414 (1965); *Redinger*, 689 S.W.2d at 418.

As in *Redinger*, the present case involves an injury caused by an activity conducted on the premises. In that regard, the *Redinger* court stated that "the general rule is that an owner or occupier does not have a duty to see that an independent contractor performs work in a safe manner." *Id.*, citing *Abalos v. Oil Development Co.*, 544 S.W.2d 627 (Tex.1976). However, the court further held that an owner has a duty to see that an independent contractor performs work in a safe manner if the owner retained the right to control any part of the work of the independent contractor. *Redinger*, 689 S.W.2d at 418. The court held

that "this rule applies when the landowner retains some control over the manner in which the independent contractor's work is performed, but does not retain the degree of control which would subject him to liability as a master." *Id.*, citing RESTATEMENT (SECOND) of TORTS § 414, comments a and c (1965).

The comments to the Restatement (Second) of Torts § 414 provide:

> a. If the employer of an independent contractor retains control over the operative detail of doing any part of the work, he is subject to liability for the negligence of the employees of the contractor engaged therein, under the rules of that part of the law of Agency which deals with the relation of master and servant. The employer may, however, retain a control less than that which is necessary to subject him to liability as master. He may retain only the power to direct the order in which the work shall be done, or to forbid its being done in a manner likely to be dangerous to himself or others. Such a supervisory control may not subject him to liability under the principles of Agency, *but he may be liable under the rule stated in this Section unless he exercises his supervisory control with reasonable care so as to prevent the work which he has ordered to be done from causing injury to others.*
> b. The rule stated in this Section is usually, though not exclusively, applicable when a principal contractor entrusts a part of the work to subcontractors, but himself or through a foreman superintends the entire job. In such a situation, the principal contractor is subject to liability *if he fails to prevent the subcontractors from doing even the details of the work in a way unreasonably dangerous to others, if he knows or by the exercise of reasonable care should know that the subcontractors' work is being so done, and has the opportunity to prevent it by exercising the power of control which he has retained in himself.* So too, he is subject to liability if he knows or should know that the subcontractors have carelessly done their work in such a way as to create a dan-

gerous condition, and fails to exercise reasonable care either to remedy it himself or by the exercise of his control cause the subcontractor to do so.

c. In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations *which need not necessarily be followed,* or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.

RESTATEMENT (SECOND) OF TORTS § 414, comments a, b and c (1965) (emphasis added).

Moreover, in *Pollard v. Missouri Pacific Railroad Co.,* 759 S.W.2d 670 (Tex.1988), the court reasserted its holding that "if a right of control over the work has a contractual basis, the fact that no actual control was exercised will not absolve a premises owner [general contractor] of liability. *It is the right of control, and not the actual exercise of control, which gives rise to a duty to see that an independent contractor performs work in a safe manner." Pollard* at 671 (emphasis added), citing *Newspapers Inc. v. Love,* 380 S.W.2d 582 (Tex.1964).

■ In the present case, appellant's contract with the project owner, the Comal Independent School District, provided, in relevant part:

[4.3.1] The [appellant] shall supervise and direct the Work using his best skill and attention. [Appellant] shall be solely responsible for all construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under the Contract.

[4.3.2] The [appellant] shall be responsible to the Owner for acts and omissions of his employees, Subcontractors and their agents and employees, and other persons performing any of the Work under a contract with the [appellant].

\* \* \* \* \* \*

[4.4.2] The [appellant] shall at all times enforce strict discipline and good order among his employees and shall not employ on the Work any unfit person or anyone not skilled in the task assigned to him.

\* \* \* \* \* \*

[4.7.2] The [appellant] shall give all notices and comply with all laws, ordinances, rules, regulations and lawful orders of any public authority bearing on the performance of the Work.

\* \* \* \* \* \*

[4.9.1] The [appellant] shall employ a competent superintendent and necessary assistants who shall be in attendance at the Project Site during the progress of the work....

\* \* \* \* \* \*

[10.1.1] The [appellant] shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the Work.

[10.2.1] The [appellant] shall take all reasonable precautions for the safety of, and shall provide all reasonable protection to prevent damage, injury or loss to:

.1 all employees on the Work and all other persons who may be affected thereby....

\* \* \* \* \* \*

[10.2.6] The [appellant] shall designate a responsible member of his organization at the site whose duty shall be the prevention of accidents....

In addition to the contract, Kent Thompson, appellant's on-site superintendent, testified that he was hired by the appellant in approximately 1985 to be a project manager. Thompson testified that, on this particular job, the appellant had two people who had ultimate authority on the job site,

Thompson, the on-site superintendent, and Mike Brumley, the superintendent.

Thompson testified that the appellant, as general contractor, had ultimate control over the job site. Moreover, appellant hired the subcontractors. Thompson stated that he had the authority to coordinate and control when the subcontractors would come out on the job, telling the subcontractors "when to be on the job and when to start work." He testified that he walked the job site everyday and "if [he] saw something that was unsafe, it was [his] responsibility to bring it to the attention of the foreman of the subcontractor who was responsible for the work."

He further testified that "if [he] saw something that [he] felt was unsafe, or if there were O.S.H.A.[1] violations, that [he], as project manager of Lawson–Avila, could stop that work right there." Furthermore, Thompson admitted that as project manager for the appellant, it was his responsibility to comply with the contract. He testified that it was the appellant's responsibility, under the contract, to comply with O.S.H.A. Thompson admitted that the contract provided that the "responsibility for the supervising and maintaining of all safety precautions... on the job site, rest[ed] with [the appellant]." In addition, Thompson testified that if the subcontractor was not

doing a good job of supervision, it was his job, as the general contractor, to make sure they did.

Appellee Keith Schoolcraft testified that the general contractor has the ultimate right of control on a job site. Schoolcraft testified that he knew Kent Thompson and Mike Brumley, representatives of Lawson–Avila. He stated that Kent Thompson spent most of his time on the job site in his office. He testified that he didn't recall seeing either Thompson or Brumley out on the job site on the day of the accident.

James Richard Katterman, who worked as a structural welder and iron worker for Weedie's Welding at the time of the accident, testified that the appellant's supervisors gave them advice out on the job and that he saw them walking around the job. He testified that the prime or general contractor, appellant, would have been ultimately responsible for enforcing O.S.H.A. regulations on the job site. He further testified that the "ultimate, overall responsibility for safety on the job site" belonged to the general contractor, appellant. He testified that this was the opinion of O.S.H.A. in the regulations. He stated that O.S.H.A. regulation 1926.16[2] provides that "in no case shall the prime contractor be relieved of overall responsibility for compli-

---

1. The trial court took judicial notice of O.S.H.A. regulations. *See generally,* Occupational Safety and Health Act, 29 C.F.R. §§ 1900–1999 (1989); *See also Daugherty v. Southern Pacific Transp.,* 772 S.W.2d 81, 83 (Tex.1989) (holding that a trial court may take judicial notice of O.S.H.A. regulations).

2. 29 C.F.R. § 1926.16 (1989), provides:

 § 1926.16 Rules of construction

 (a) The prime contractor and any subcontractors may make their own arrangements with respect to obligations which might be more appropriately treated on a jobsite basis rather than individually. Thus, for example, the prime contractor and his subcontractors may wish to make an express agreement that the prime contractor or one of the subcontractors will provide all required first-aid or toilet facilities, thus relieving the subcontractors from the actual, but not any legal, responsibility (or, as the case may be, relieving the other subcontractors from this responsibility). *In no case shall the prime contractor be relieved of overall responsibility for compliance with*

 *the requirements of this part for all work to be performed under the contract.*
 (b) By contracting for full performance of a contract subject to section 107 of the Act, *the prime contractor assumes all obligations prescribed as employer obligations under the standards contained in this part, whether or not he subcontracts any part of the work.*
 (c) To the extent that a subcontractor of any tier agrees to perform any part of the contract, he also assumes responsibility for complying with the standards in this part with respect to that part. Thus, *the prime contractor assumes the entire responsibility under the contract* and the subcontractor assumes responsibility with respect to his portion of the work. *With respect to subcontracted work, the prime contractor and any subcontractor or subcontractors shall be deemed to have joint responsibility.*
 (d) Where joint responsibility exists, *both the prime contractor and his subcontractor or subcontractors, regardless of tier, shall be considered subject to the enforcement provisions of the Act.* (emphasis added)

ance with the requirements of this part for all work to be performed under the contract." He further testified that in accordance with O.S.H.A., the general contractor, through contract, can delegate some of the responsibility to the subcontractors, but is not relieved of liability.

Boone Custer, a construction consultant who testified for appellees, testified that the overall responsibility for compliance with the requirements of work is with the general contractor. He testified that "the ultimate responsibility to provide a safe place to work" would have been with "the prime or general contractor."

Paul Lawson, president of Pepper–Lawson Construction, formerly Lawson–Avila Construction, appellant, testified that he participated in and signed the contract between appellant and the Comal Independent School District. He stated that Kent Thompson and Mike Brumley were on the job site to supervise the work and when they were on the job site, they "were acting in a management or supervisory capacity for Lawson–Avila." He testified that they had the ultimate responsibility for the task of the general contractor, appellant, at Smithson Valley High School. He testified that his assessment was that the accident occurred because the crane was overloaded.

Lawson testified that as president of Lawson–Avila, he participated in the hiring of the subcontractors, determining which bids and which subcontractors to accept. He testified that as the general contractor, appellant "was entitled with its subcontractors to stop them if the work wasn't being performed in a proper manner." He testified that when he went out on the job site, he would make inspections and that if he saw work wasn't being done properly, he, as the general contractor, could have stopped that work. He further testified that if he or any of his management people observed work that was being done in an unsafe manner, that work could be stopped as well.

Moreover, Lawson stated that he understood that under the contract, appellant was responsible for the safety of the project. He further testified that, as part of the conditions of the contract, appellant, the contractor, would be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the work. He testified that he understood that, as the contractor, appellant "would take all reasonable precautions for the safety of and provide all reasonable protection to prevent damage, injury or loss to all employees on the work or other persons who might be affected by that." He testified that he understood that appellant was required, as contractor, to "give all notices and comply with all applicable laws, ordinances, rules, regulations and lawful orders of any public authority bearing on the safety of persons or property or their protection from damage or injury."

Lawson testified that as general contractor, appellant needed to observe the entire job to be sure that O.S.H.A. safety regulations were being followed. He testified that, as the prime contractor, appellant "had an overall responsibility for the compliance of O.S.H.A. on that job site."

He testified that although the subcontractors had the same obligations as the prime or general contractor, that did not relieve the prime contractor of authority to tell the subcontractors what to do and, if the sub-contractors were not complying, appellant had the right to remove them.

Don Faulkner, the manager of Capital Rentals, testified that the general contractor has the ultimate responsibility or control on a job site. He testified that one of the general contractor's responsibilities is to comply with safety provisions and require the subcontractors and employees of the subcontractors to comply with them.

We hold that under these facts, there was sufficient evidence of appellant's right to control and we thereby hold that appellant owed a legal duty of care to an independent contractor's employees. Appellant's first point of error is overruled.

■ In its second point of error, the appellant argues that the trial court erred in failing to submit a question inquiring whether Lawson–Avila retained the right

to control an independent contractor's performance of its work activity sufficient to give rise to a duty to exercise ordinary care for the safety of an employee of that independent contractor. While resolution of a defendant's breach of duty is a question of fact, *Rudolph v. ABC Pest Control, Inc.,* 763 S.W.2d 930, 933 (Tex.App.—San Antonio 1989, writ denied), the existence of a legal duty under a given set of circumstances is a question of law for the court. *Bryant v. Gulf Oil Corp.,* 694 S.W.2d 443, 446 (Tex.App.—Amarillo 1985, writ ref'd n.r.e.). It is not necessary to submit an issue regarding a pure issue of law. *Hercules Exploration, Inc. v. Halliburton Co.,* 658 S.W.2d 716, 724 (Tex.App.—Corpus Christi 1983, writ ref'd n.r.e.).

■ Moreover, appellant, in objecting to the charge, further implied that the appellant's negligence was improperly inquired about in "broad form." Such broad form submission is encouraged. Rule 277 of the Texas Rules of Civil Procedure provides:

> In all jury cases the court shall, whenever feasible, submit the cause upon broadform questions. The court shall submit such instructions and definitions as shall be proper to enable the jury to render a verdict.

TEX.R.CIV.P. 277. The trial court has wide discretion in determining the proper issues and instructions to be submitted to the jury, *Mobil Chemical Co. v. Bell,* 517 S.W.2d 245, 255 (Tex.1974); *Scott v. Ingle Bros. Pacific, Inc.,* 489 S.W.2d 554, 557 (Tex.1972), and broad issues are the preferred manner of submission in negligence cases. *Island Recreational Dev. Corp. v. Republic of Texas Savings Assoc.,* 710 S.W.2d 551, 554 (Tex.1986); *Lemos v. Montez,* 680 S.W.2d 798, 801 (Tex.1984); *Mobil Chemical Co. v. Bell,* 517 S.W.2d 245 (Tex.1974). Appellant's second point of error is overruled.

■ In its third point of error, the appellant argues that, if there were any acts or omissions by appellant which violated their duty of care to the independent contractor's employees, the trial court erred in submitting Question No. 1 without an instruction confining the jury's consideration

to such acts or omission. As authority for its contention, appellant cites *Agricultural Warehouse, Inc. v. Uvalle,* 759 S.W.2d 691, 695–96 (Tex.App.—Dallas 1988), *writ denied per curiam,* 779 S.W.2d 68 (Tex.1989). However, appellant's reliance is misplaced. The decision in *Agricultural* centered on the fact that the court had misstated the law in its instruction to the jury. The court improperly stated that the "landowner has a duty to *make certain* that the construction site is maintained in a safe condition." The court of appeals held that the landowner only had the duty to use "reasonable care" to keep the premises safe and not the greater burden "to make certain." 759 S.W.2d at 694. Moreover, the supreme court denied writ and stated "our denial, however, does not imply approval of the 'definition' or instructions ..." 779 S.W.2d at 68. We find no error in the trial court following Rule 277 without unnecessary and dangerous instructions which would be susceptible to an objection as a comment on the weight of the evidence. *See* TEX.R.CIV.P. 278. Appellant's third point of error is overruled.

### Gross Negligence and Exemplary Damages

■ In its fourth point of error, the appellant contends that the "gross negligence" standard upon which Texas allows exemplary damages is unconstitutionally vague and deprives a defendant of its due process rights. More specifically, appellant alleges that the definition of gross negligence fails "to state with precision the mental state necessary to support the award of exemplary damages." Appellant argues that the definition of gross negligence "allows the jury to base an award of exemplary damages on conduct amounting to no more than ordinary negligence." As a result, appellant argues, appellant was "deprived of due process under the Fifth and Fourteenth Amendments of the United States Constitution and Article I, section 19 of the Texas Constitution."

In *Burk Royalty v. Walls,* 616 S.W.2d 911 (Tex.1981), the Texas Supreme Court defined gross negligence as:

[T]hat entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the right or welfare of the person or persons affected by it.

*Burk Royalty* at 920. The court stated that "[t]he jury is not simplistically instructed that it must find an 'entire want of care,' but '... *such* an entire want of care as ... shows the act or omission was the result of conscious indifference.'" *Id.* at 922 (emphasis in original). The court continued:

What lifts *ordinary* negligence into *gross* negligence is the mental attitude of the defendant ... The plaintiff must show that the defendant was consciously, i.e., knowingly, indifferent to his rights, welfare and safety. In other words, the plaintiff must show that the defendant knew about the peril, but his acts or omissions demonstrated that he didn't care. Such conduct can be active or passive in nature.

*Id.* at 922.

In *Burk Royalty,* moreover, the court established standards for appellate review of a jury's gross negligence finding. The court stated:

In determining whether there is some evidence of the jury's finding of gross negligence, the reviewing court must look to all of the surrounding facts, circumstances, and conditions, not just individual elements or facts....

\* \* \* \* \* \*

All actions or circumstances indicating a state of mind amounting to conscious indifference must be examined in deciding if there is some evidence of gross negligence.

*Burk Royalty,* 616 S.W.2d at 922.

Indeed, "Gross negligence" was defined in the present case's jury charge as follows:

"Gross negligence means such an entire want of care as to indicate that the act or omission in question was the result of conscious indifference to the rights, welfare, or safety of the persons affected by it."

We hold that the gross negligence standards upon which Texas allows exemplary damages is not vague and amply satisfies the due process safeguards guaranteed by the federal and state constitutions. *See Victoria Bank & Trust Co. v. Brady,* 779 S.W.2d 893, 913 (Tex.App.—Corpus Christi 1989, no writ). This is particularly true where we find, as we do below, that the award of exemplary damages was not excessive or unreasonable. *See Browning–Ferris Industries v. Kelco Disposal, Inc.,* —— U.S. ——, 109 S.Ct. 2909, 2920, 106 L.Ed.2d 219 (1989) (Brennan, J., joined by Marshall, J., concurring) (implying that the Due Process Clause forbids damage awards that are "grossly excessive," or "so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable.").

■ In its fifth point of error, the appellant contends that a finding of gross negligence or exemplary damages must be based on "clear and convincing evidence." Appellant primarily argues that "because punitive damages are penal in nature, a finding of exemplary damages must be predicated on a heightened standard of proof." This issue has previously been considered in *Ford Motor Co. v. Durrill,* 714 S.W.2d 329 (Tex.App.—Corpus Christi 1986), *writ granted and vacated,* 754 S.W.2d 646 (Tex.1988). We initially note that writ in *Ford Motor Co. v. Durrill* was granted on points of error that involved actual damages, not on points of error related to the court's reasoning as to exemplary damages. *See Durrill v. Ford Motor Co.,* 31 Tex.Sup.Ct.J. 96 (Dec. 5, 1987). In *Durrill,* the appellant also argued that "the burden of proof regarding gross negligence issues should be a 'clear and convincing' standard rather than a 'preponderance of the evidence' standard." In holding that "the burden of proof in cases involving gross negligence and exemplary damages is by a preponderance of the evidence," the Corpus Christi Court of Appeals reasoned:

The general rule in civil cases is that a party having the burden of proof must establish its case by preponderance of

the evidence. *State v. Turner*, 556 S.W.2d 563 (Tex.1977). Generally, the clear and convincing standard of proof has been used in those civil cases which present issues of constitutional proportions. *See In the Interest of G.M.*, 596 S.W.2d 846 (Tex.1980); *Addington v. State*, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). The standard has also been utilized in cases involving fraud or quasi-criminal actions. There, the burden is increased because the interests at stake may involve more than money, such as the defendant's reputation. [Appellant] argues that the case at bar falls within this latter category. While [appellant's] argument has some validity as shown by its discussion of the law in several other jurisdictions which have adopted this standard, it is not applicable in Texas. We follow the Texas precedent established by the Courts of this State and hold that the burden of proof in cases involving gross negligence and exemplary damages is by a preponderance of the evidence. *See International Armament v. King*, 686 S.W.2d 595 (Tex.1985); *Ford Motor Co. v. Nowak*, 638 S.W.2d 582 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.).

*Ford Motor Co. v. Durrill*, 714 S.W.2d at 347.

We adopt this reasoning and continue to follow "the Texas precedent established by the Courts of this State and hold that the burden of proof in cases involving gross negligence and exemplary damages is by a preponderance of the evidence." Appellant's fifth point of error is overruled.

▮ In its sixth point of error, the appellant argues that the evidence was factually insufficient to support a finding of gross negligence against the appellant. In reviewing factual insufficiency contentions, "we must consider and weigh all of the evidence, including any evidence contrary to the trial court's judgment." *Burnett v. Motyka*, 610 S.W.2d 735, 736 (Tex.1980). However, we may not substitute our conclusions for that of the trier of fact, *Pool v. Ford Motor Co.*, 715 S.W.2d 629 (Tex. 1986), nor may we pass on the credibility of the witnesses or the weight to be given their testimony. *Benoit v. Wilson*, 150 Tex. 273, 239 S.W.2d 792 (1951). We may not interfere with the trier of fact's resolution of conflicts in the evidence. *Id.* Thus, if there is competent evidence of probative force which supports the facts in issue, the findings of the trier of fact will be sustained unless we find the evidence insufficient or so against the great weight and preponderance of the evidence as to be manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986).

▮ In addition to the evidence supporting our finding that appellant had the right to control, particularly the testimony of appellant's representatives that appellant was responsible for the safety of the project, Kent Thompson, appellant's on-site superintendent, testified that he had no idea whether the crane operator hired by Capital Rentals was competent. Thompson testified that he did not know any specific O.S.H.A. crane regulations that applied to the use of the crane on the job site. He testified that they had safety meetings on the job site, but none of the safety meetings ever dealt with the safe operation and procedures in using cranes. He testified, moreover, that neither he nor Mike Brumley, appellant's superintendent, ever inspected the Grove crane that was involved in the accident nor did they ever take the time to check the procedures that were being followed by Capital Rentals and its people. He further admitted that neither he nor Mr. Brumley ever discussed the job with Tommy Bullard, the crane operator. He testified that he would "basically go to the erection foreman ... to instruct them of what basic methods" were needed to be done, but that he did not "get into the details of what their crane operator" was going to do.

During cross-examination, Thompson testified that both Stoutamire and Schoolcraft worked for Weedie's Welding and that Weedie's hired Capital Rentals. Thompson testified that Weedie's had worked with appellant on various stages of the job and that he felt that Weedie's was very competent. He testified that he had never ob-

served any unsafe practices that Weedie's permitted any crane operator to perform or to follow. He said that "it was a very safe operation." He testified that he believed that Weedie's had a superintendent on the job who was in charge of the erection and who directed the Capital Rentals crane operator. Thompson stated that none of the Weedie's crew complained about the way that Tommy Bullard was operating the crane during the time that Bullard was on the scene.

Thompson stated that Weedie's was in charge of getting the steel transported from the ground by the crane to the beams and installed. He stated that he had no reason to believe that any unsafe practices were being performed. He stated that when he saw Mr. Bullard after the accident, Bullard stated, "I guess I went over the chart."

Thompson testified that he would expect the Weedie's superintendent to instruct Capital Rentals in connection with any unsafe practices he observed. Moreover, Thompson stated that he would expect the superintendent to arrange for the crane to come every morning and he would expect the superintendent to "get with the operator, explain what needed to be done, where to set up, what was being lifted...." He testified that nothing was ever brought to his attention by anyone from Weedie's that there was any problem with the crane operator.

In spite of his prior testimony, Thompson, nevertheless, admitted that he was aware that Weedie's own crane had tipped over prior to this incident, which resulted in Weedie's obtaining the Capital Rentals crane. Moreover, he admitted that he was aware that, prior to the accident, appellant's own workers had tipped a "cherry picker," an industrial boomlift, on the job site.

When asked why the Capital Rentals crane tipped over, he testified that he believed that the crane was extended out too far. He testified that as the boom on a crane is extended, the crane becomes more and more "tippy." He stated that the boom on the crane involved in the accident

was down 43 degrees and was fully extended. He further testified that the area where the crane was operating was not "coned off" for safety.

The overall evidence indicates that Thompson was aware that Weedie's Welding had tipped over their own crane and that appellant's own employees had tipped over a piece of machinery known as a "cherry picker" on the job site. Although he was appellant's on-site superintendent and responsible for safety, he was unfamiliar with O.S.H.A. regulations, was particularly unaware of O.S.H.A. regulations related to crane safety, and never inspected the crane or checked the procedures being followed in operating the crane. Moreover, the evidence indicates that while responsible for safety and inspections, both of appellant's superintendents stayed in their office trailer and were not seen on the grounds on the day of the accident, until immediately after the accident, when they belatedly attempted to ensure compliance with safety regulations.

Appellee Keith Schoolcraft testified that at the time of the accident, he had been employed by Weedie's Welding for approximately one year. He stated both he and Stoutamire were primarily iron workers on the job and also welders at times. He testified that on the day of the accident, he was working as a connector, putting the iron in place when the crane swung it onto the building. He stated that Stoutamire was working as his connecting partner. Schoolcraft stated that it was Capital Crane's job to get the steel up to the top. He testified that on the day of the accident, he was communicating with the crane operator by hand signals. He also testified that appellant's supervisors, Brumley and Thompson, spent most of their time in their office and were not seen on the job site on the day of the accident.

On cross-examination, Schoolcraft testified that the operator determines where the crane is to be placed. He stated that he believed that it was Weedie's iron foreman who told the crane operator where to place the load. Schoolcraft testified that James Katterman was giving Schoolcraft

signals and Schoolcraft was relaying the signals to the operator. He stated that Katterman couldn't see the crane operator and the crane operator couldn't see Katterman. Schoolcraft stated that at the time of the accident, the load on the crane was going to a different location than where they had been putting loads all morning. He stated that was the only load that was going to be put in that different location.

He stated that every crane has a chart on the side of it that shows the hand signals.[3] Prior to the accident, he shrugged his shoulders at the crane operator, meaning to ask him if the crane operator could go further. He testified that they had set up the crane to where the majority of the loads were going, although one load was going to a different spot than the majority of the other loads. He testified that the crane had been operating at full extension all morning and the reason that he stopped and shrugged, instead of telling the crane operator to just keep coming, was because he knew that the operator was "getting close to the maximum capacity." However, he stated that it is the operator who makes the decision of when the crane is at maximum capacity. He stated that he was attempting to ask the crane operator whether "he could or couldn't ... keep coming" and despite his "feeling that the crane was getting to the point where it was going to start getting light," he gave the operator a signal to move the load. The operator "kept coming" and then the crane tipped. Schoolcraft testified that Weedie's had hired the crane company to send a crane and an operator. He testified that he and the other iron workers directed the crane throughout the morning and the operator had performed every load with no problem until the one that collapsed.

James Richard Katterman testified that he was working as a structural welder and iron worker for Weedie's Welding at the time of the accident. He testified that if you want a crane operator to move a load in a given direction, the crane operator should be the one to tell you whether or not he can make it that far. He stated that when a crane operator reaches the capacity of his crane, they usually set the load down on the ground, move the crane and pick the load up again. He testified that it sometimes takes a lot of time for the operators to move the crane and, therefore, it probably upsets the operators when they have to do that.

Boone Custer, a construction consultant, testified that the lifting capacity of a crane changes with the radius, or how far you're going out with the load. He testified that the Grove chart is required by the federal government, by O.S.H.A., to be mounted inside the operator's cab. The chart, he stated, helps the operator to determine whether or not the lift he is preparing meets the requirements for a safe lift. He stated that a crane operator, when he gets to the job site, should check with the superintendent to verify what weights and lifts he will be making during the day, so that he can use the Grove chart correctly. He stated that the crane would lift the greatest weight over the rear. He testified that when you go off the chart, you're normally going to tip the crane because you exceeded what you can pick up. He testified that the crane involved in the accident had the boom fully extended to 136 feet and the crane tipped over because the operator exceeded what the Grove chart listed as the maximum capacity for the working radius he was at. He testified that he determined that 75 feet would have been a safe working radius and estimated the actual radius that the crane was taken out to be around 94 to 95 feet.

He testified that the maximum angle that you could have taken the 75 foot radius at "would have been a 55 degree angle working with the 136 foot of boom" and any operations with the crane would change the working radius. As the working radius changes, the load capacity chart and maximum lifting load changes. As the working radius increases, the amount of

---

**3.** 29 C.F.R. § 1926.550(a)(4) (1989), provides: (4) Hand signals to crane and derrick operators shall be those prescribed by the applicable ANSI standard for the type of crane in use. An illustration of the signals shall be posted at the job site.

weight that can be lifted changes. As you boom up, the working radius decreases, thereby increasing the amount of weight that can be lifted. As you boom down, the working radius increases, decreasing the amount of weight that can be lifted.

He testified that the crane involved in the accident went off the charts and the crane operator violated O.S.H.A. regulation 1926.550(a)(2) [4], "which tells us that rated load capacity and recommended operators must not be exceeded." Moreover, he concluded that 1926.550(a)(1) [5], "which specifically states that the employer shall comply with the manufacturer's specifications and limitations applicable to the operation of the crane," was violated.

He stated that to ensure that O.S.H.A. regulations are followed on the job, the general contractor should "conduct job site inspections to observe whether or not the subcontractors working under his control are, in fact, performing as they should in accordance with safety requirements." He further testified that to ensure that O.S. H.A. regulations are followed, the general contractor should have ensured that the "operator and the crane rental company knew what type of lifts they were going to be making, the basic weights of the material that they would be working with, what areas they would be moving the material to, and see if the operator did, in fact, understand what were the requirements of that particular job for that day in regards to safety aspects, which means O.S.H.A." The witness testified that he found no facts indicating that appellant took action to enforce O.S.H.A. regulations on the crane.

He testified that all cranes are required by law to have a boom angle indicator, which helps to determine the angle of the crane. He testified that Tommy Bullard,

the crane operator, failed "to act as a reasonably prudent crane operator in that he allowed the crane to go off the charts and . . . was not even using the charts at the lift time." He testified that, in his opinion, Tommy Bullard and his employer, Capital Rentals, "did, in fact, have a conscious disregard for the rights of safety. They violated the safety regulations apparently with no concern about them."

On cross-examination, Custer testified that the crane operator was in charge of determining the weight of the load lifted by the crane. He stated that the crane operator should have obtained the weight of the load that he was going to be lifting from the project superintendent or the project manager. He testified that if the crane operator were given an incorrect figure for the weight of the load to be lifted, it would be the crane "operator's fault for not asserting it for sure, but it would also be the contractor's fault for not presenting [the operator] with the right information."

He testified that in his opinion, "the [appellant] did not act as a reasonably prudent general [contractor] should have in not providing closer supervision as regards to possible safety hazards developing on the job site." He stated that he was aware that the [appellant] never talked to the particular crane operator. Furthermore, he testified that he felt "it was a willful disregard of [the appellant's] responsibility to supervise if they never even talked to the [crane operator]," although he admitted that he had previously answered "no" in a deposition when asked 'whether he had seen any act that the general contractor did to cause the accident.'

Paul Lawson, president of Pepper–Lawson Construction, formerly Lawson–Avila

4. 29 C.F.R. § 1926.550(a)(2) (1989), provides: (2) Rated load capacities, and recommended operating speeds, special hazard warnings, or instruction, shall be conspicuously posted on all equipment. Instructions or warnings shall be visible to the operator while he is at the control station.

5. 29 C.F.R. § 1926.550(a)(1) (1989), provides: (a) **General requirements.** (1) The employer shall comply with the manufacturer's specifications and limitations applicable to the oper-

ation of any and all cranes and derricks. Where manufacturer's specifications are not available, the limitations assigned to the equipment shall be based on the determinations of a qualified engineer competent in this field and such determinations will be appropriately documented and recorded. Attachments used with cranes shall not exceed the capacity, rating, or scope recommended by the manufacturer.

Construction, appellant, testified that he gave no special instructions to his management people with reference to the enforcement of O.S.H.A. regulations that applied to crane operation. On cross-examination, he testified that he was present quite a bit on that particular job. He testified that he found Palmer Steel to be a competent operator on a previous project done for appellant. He testified that Palmer Steel subcontracted a portion of its job with Weedie's Welding, and Weedie's then rented a crane operated from Capital Equipment. He stated that appellant did not rent the crane. He stated that the subcontractors are relied on to perform their work in a responsible and professional manner.

Don Faulkner, the manager of Capital Rentals, stated that when he got to the job site immediately after the accident, the general contractor's representatives "had a meeting." As a result, the employees were sent scurrying "to their cars to get their hard hats, their safety belts, put their shirts on, and there was a mad dash ..." Furthermore, Faulkner testified that "safety rails were starting to be built for the project" immediately after the accident. The efforts indicated attempts to correct non-compliance with safety regulations.

He testified that if the crane operator goes off the load charts, "he's not doing what he's supposed to." Faulkner testified that when an inspection of the crane was performed after the accident, they learned that the boom angle indicator was out. He testified that the boom angle indicator is "not a 100 percent reliable device for the operators to work off of because they do vary in degrees. So your safest way at all times [is to] actually [go] through your boom length and your radius." He further testified that the crane was not equipped with a "load moment indicator."

On cross-examination, Faulkner testified that when hiring a crane operator they look for a minimum of three to five years of experience, check his references, check his safety record and his accident record. After that, they still train them to operate the crane the way "we expect them to do it." He testified that Tommy Bullard no longer worked for them. He further testified that the crane operator is completely at the control of the foreman on the job. "They tell us where to pick, where [the load] is laying, and where they're going.... So that's how [the crane operator] determines his radius."

After reviewing the evidence, we find that under these facts, there was competent evidence of probative force to support the finding of gross negligence. Appellant's sixth point of error is overruled.

 In their seventh point of error, the appellant argues that the exemplary damages were excessive. "Exemplary damages must be reasonably proportioned to actual damages." *Alamo Nat'l Bank v. Kraus*, 616 S.W.2d 908, 910 (Tex.1981). However, there is no set rule or ratio between the amount of actual and exemplary damages which will be considered reasonable. *Id.* A determination of reasonableness must depend upon the facts of each particular case. *Id.* "Factors to consider in determining whether an award of exemplary damages is reasonable include (1) the nature of the wrong, (2) the character of the conduct involved, (3) the degree of culpability of the wrongdoer, (4) the situation and sensibilities of the parties concerned, and (5) the extent to which such conduct offends a public sense of justice and propriety." *Id.* The amount to be awarded as exemplary damages rests in the discretion of the jury, *Southwestern Inv. Co. v. Neeley*, 452 S.W.2d 705, 708 (Tex.1970), and will not be disturbed on appeal on the grounds of excessiveness if there is any probative evidence to support it. *See Delta Drilling Co. v. Cruz*, 707 S.W.2d 660, 666 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.). "[U]nless the award is so large as to indicate that it is a result of passion, prejudice, or that the evidence has been disregarded, the verdict of the jury is conclusive and will not be set aside as excessive, either by the trial court or on appeal." *Kraus v. Alamo Nat'l Bank*, 586 S.W.2d 202, 208 (Tex.Civ.App.—Waco 1979), *affirmed and cited with approval, Alamo Nat'l Bank v. Kraus*, 616 S.W.2d at 910.

The total amount of actual damages awarded to appellees amounted to approximately $1,324,000, excluding amounts awarded to appellee Schoolcraft for loss of future earnings. Exemplary damages in the amount of $1,500,000 were assessed against appellant Lawson–Avila. In light of our holding that the evidence was sufficient to support an award of exemplary damages, we hold that the exemplary damages are reasonably proportionate to the actual damages. Appellant's seventh point of error is overruled.

In a separate cross-point, appellee Schoolcraft argues that the trial court erred in granting appellant's motion for Judgment Notwithstanding the Verdict as to the jury's award of $10,000 in damages for physical impairment in the future in that there was evidence to support the jury's award. A trial court is authorized to set aside a jury finding only when there is no evidence to support the finding. *Campbell v. Northwestern Nat. Life Ins. Co.*, 573 S.W.2d 496, 497 (Tex.1978); *De Alonzo v. Solis*, 709 S.W.2d 690, 692 (Tex.App.—San Antonio 1986, writ ref'd n.r.e.); TEX. R.CIV.P. 301. "In determining that there is 'no evidence' to support a jury finding, the court must consider the evidence in the light most favorable to the finding, considering only the evidence and inferences which support the finding, and rejecting the evidence and inferences contrary to the finding." *Campbell*, 573 S.W.2d at 497; *De Alonzo*, 709 S.W.2d at 692.

The legal test for physical impairment is that "plaintiff must sustain the burden of proving that the effect of his physical impairment extends beyond any impediment to his earning capacity and beyond any pain and suffering to the extent that it produces a separate and distinct loss that is substantial and for which he should be compensated." *Green v. Baldree*, 497 S.W.2d 342, 350 (Tex.App.—Houston [14th Dist.] 1973, no writ), *Accord Southern Pacific Transp. Co. v. Harlow*, 729 S.W.2d 946, 950 (Tex.App.—Corpus Christi 1987, writ denied); *Landacre v. Armstrong Bldg. Maintenance Co.*, 725 S.W.2d 323, 324 (Tex.App.—Corpus Christi 1986, writ

ref'd n.r.e.); *Baker Marine Corp. v. Herrera*, 704 S.W.2d 58 (Tex.App.—Corpus Christi 1985, writ ref'd n.r.e.); *Allen v. Whisenhunt*, 603 S.W.2d 242, 244 (Tex.Civ. App.—Houston [14th Dist.] 1980, writ dism'd); *Browning v. Paiz*, 586 S.W.2d 670, 675 (Tex.Civ.App.—Corpus Christi 1979, writ ref'd n.r.e.); *French v. Grigsby*, 567 S.W.2d 604, 607 (Tex.Civ.App.—Beaumont 1978, writ ref'd n.r.e.); *Texas Farm Products Co. v. Leva*, 535 S.W.2d 953, 959 (Tex.Civ.App.—Tyler 1976, no writ). In *Harlow*, the evidence showed that the plaintiff had given up racquetball and the recreational activities that he engaged in before the accident, that the plaintiff would have a five-percent physical impairment to his whole arm, that the plaintiff suffered pain "likened to a chronic condition," and that continued use of his arm for strenuous tasks would aggravate his shoulder. 729 S.W.2d at 950–51. The court held that this was sufficient to support a finding of physical impairment in the future. *Id.* at 951. In *Allen v. Whisenhunt*, the court held that evidence that the plaintiff could no longer mow lawns, play basketball and engage in strenuous tasks was sufficient to support an award of $30,000 for future physical impairment. 603 S.W.2d at 244. In *French v. Grigsby*, the evidence showed that the plaintiff participated in several athletic activities—golf, tennis, volleyball, bowling, jogging—and enjoyed camping and hiking prior to her accident. As a result of the accident, she had difficulty walking and was unable to "fully participate in the athletic and outdoor activities which were such a central part of her life prior to the accident." Consequently, the court held that the evidence was legally and factually sufficient to support the jury's award of $75,000 for physical impairment. 567 S.W.2d at 607–08.

In the present case, appellee Schoolcraft testified that as a result of the accident, he had a broken bone in his wrist, two compression fractures of vertebrae in his back and a bruised kidney. He testified that as a result of the accident, he was out of work for about a year and a half. He testified that he was now employed as a "lead man" for MF Construction, supervis-

ing iron workers but is not able to carry the equipment that he used to.

Schoolcraft stated that he liked to do a lot of outdoor sports such as fishing, hunting, and playing golf, but no longer could golf, fish, and hunt in the same amounts as he did before the accident. He testified that he had been riding horses his entire life. Additionally, Schoolcraft testified that if he did anything strenuous, his back would start hurting. He stated that his back continued to hurt and bother him. His back bothers him "in the morning's after [he's] been sleeping for a while," and bothered him "after [he] does any kind of lifting of heavier than normal things."

Doctor Richard Kiepfer testified that his practice consists of rehabilitation of people who have been injured. He stated that he had seen and treated appellee Schoolcraft. Dr. Kiepfer testified that appellee Schoolcraft had a fracture of one of the bones in his wrist and a compression fracture of the vertebra in his back. He testified that further compression was possible just on the basis of the weight of Schoolcraft's upper portion of his body being put on the compression fracture. He testified that he had prescribed two braces for Schoolcraft, one that "put pressure on the upper portion of the chest, the lower portion of the pelvis," and another one in the back, to hold him in a position with the bone spread out.

Dr. Kiepfer testified "if [Schoolcraft] could tolerate horseback riding it would be good exercise for his back, but if it hurt him he would have to try it and then stop." As a result of that recommendation, the Dr. testified, appellee sold his horses, because when the appellee tried riding horseback it hurt appellee's back, although appellee had been riding horses his entire life.

The Dr. further testified that appellee was still under his care for continued pain in his back. He stated that when he last saw the appellee, the appellee was walking with a slight limp and was having trouble sleeping because of back pain. The Dr. testified that the appellee, who was only 27 years old, could expect to continue having back pain for the rest of his life. He further testified that appellee would "have

to restrict his activities for the rest of his life." Moreover, he stated that he anticipated that appellee's condition would become worse as time passes. We find that the evidence was sufficient to support a jury award for physical impairment in the future and thus, reinstate the jury's award of $10,000 for appellee Schoolcraft's physical impairment in the future.

The judgment is affirmed as reformed.