SOUTHERN PACIFIC TRANSPORTA-TION COMPANY and Port Terminal Railroad Association, Appellants,

v.

Robert R. HARLOW, Appellee.

No. 13-85-557-CV.

Court of Appeals of Texas, Corpus Christi.

April 9, 1987.

Rehearing Denied May 7, 1987.

Gordon A. Holloway, Claude R. Treece, Sewell & Riggs, JoAnn Storey, W.T. Womble, Crain, Caton, James & Womble, Houston, for appellants.

J. Donald Bowen, David R. Miller, Helm, Pletcher, Hogan & Bowen, Houston, Bert L. Huebner, Bay City, for appellee.

Before UTTER, SEERDEN and DORSEY, JJ.

## OPINION ON MOTION FOR REHEARING

UTTER, Justice.

This Court's opinion and judgment of November 26, 1986, are hereby withdrawn, and the following opinion is substituted therefor.

This is an appeal from a jury verdict awarding Robert Harlow damages against Southern Pacific Transportation Company and Port Terminal Railroad Association (PTRA) for injuries he suffered in a railroad collision. We affirm the judgment of the trial court.

In their first points of error, PTRA and Southern Pacific both argue that the trial court erred in not granting their motions to transfer venue to Harris County. Harlow admitted that he is a resident of Harris County, Texas and the accident made the basis of the suit occurred in Harris County. However, suit was filed in Matagorda County, a county through which the railroads extend or operate. The interpretation of venue provisions found in Tex.Civ. Prac. & Rems.Code Ann. §§ 15.034 and 15.-036, (Vernon 1986),[1] is at issue. These provide, under the heading entitled, *SUBCHAPTER C. PERMISSIVE VENUE:*

§ 15.034 Railway Personal Injuries

A suit against a railroad corporation or against any assignee, trustee, or receiver operating any railway in this state for damages arising from personal injuries, resulting in death or otherwise, *shall* be brought either in the county in which the injury occurred or in the county in which the plaintiff resided at the time of the injury. If the defendant railroad corporation does not run or operate its railway in or through the county in which the plaintiff resided at the time of the injury and has no agent in that county, then the suit shall be brought either in the county in which the injury occurred, or in the county nearest that in which the plaintiff resided at the time of the injury, in which the defendant corporation runs or operates its road or has an agent. When an injury occurs within one-half mile of the boundary line dividing two counties, suit may be brought in either of those counties. If the plaintiff is a nonresident of this state, the suit shall be brought in the county in which the injury occurred or in the county in which the defendant railroad corporation has its principal office. [emphasis ours]

§ 15.036 Corporations and Associations

A suit against a railroad corporation or against any assignee, trustee, or receiver operating its railway *may* also be brought in any county through or into which the railroad of the corporation extends or is operated. A suit against a receiver of a person or a corporation may also be brought as otherwise provided by law. [emphasis ours]

---

1. The changes referred to this opinion were actually embodied in the 1983 amendment to Article 1995, the state's venue statute. In 1985 the legislature enacted the Civil Practice and Remedies Code (Code). Chapter 15 of the Code is a codification of the fourth section of the 1983 amended venue statute as well as a fifth section concerning suits in justice courts.

The railroads make the following arguments in support of their position that § 15.034 is mandatory: 1) the placement of § 15.034 in Subchapter C is inadvertent and the plain language of the statutes make § 15.034 mandatory; 2) prior case law clearly established the substantive law and held the verbatim predecessor section mandatory; 3) the Legislature is presumed to have intended to maintain prior substantive law in effect; 4) the title of a section or a subchapter has no substantive effect; and 5) the specific provision of § 15.034 must control over the general provisions of § 15.036.

Appellee argues that the 1983 amendments to art. 1995 materially changed the law. He argues that the titles or headings of the statute are significant in this instance. Appellee also claims that there is no doubt about the legislature's intent because § 15.034 has specifically been designated to be permissive.

Identical arguments have been addressed clearly, concisely and we believe correctly, by the Houston Court of Appeals (14th District) in *Burlington Northern Railroad Co. v. Harvey,* 717 S.W.2d 371 (Tex.App.— Houston [14th Dist.] 1986, writ ref'd n.r.e.).

■ We note, in addition to the observations and reasoning of the Houston court in *Burlington,* the designation of the heading as "Permissive Venue" in the new law was made by the legislature and not by a publisher. Appellee makes the following argument with which we agree.

"The 1983 amendment to Article 1995 was not a reenactment 'without material change,' as Appellants suggest, but was a major amendment and restructuring of the Texas venue law. Sixteen of the subdivisions of Article 1995 were omitted from the amended version altogether, ... [P]rior to the 1983 amendment, the courts construed eleven of the subdivisions of Article 1995 as mandatory: Subdivisions 14 (Lands), 16 (Divorce), 17 (Injunctions), 17a (Labor Disputes), 18 (Revision of Probate), 19 (Suits Against Counties), 20 (Heads of Departments), 22 (Railway Lands), 25 (Railway Personal Injuries), 29 (Libel or Slander), and 30 (Special Venue). Of these eleven subdivisions which had previously been contrued as mandatory, only six were incorporated into the 'Mandatory Venue' subchapter of the new Venue Act: Subdivisions 14, 17, 19, 20, 29 and 30. Four of the previously mandatory subdivisions were left out of the Venue Act altogether: Subdivisions 16, 17a, 18 and 22. Two former permissive subdivisions of Article 1995 were made mandatory by inclusion within Subchapter B: Subdivisions 12 and 13. Finally, Subdivision 25, which had previously been construed to be mandatory, was placed into the 'Permissive Venue' section, Subchapter C. It is evident that the 1983 amendment of Article 1995 was neither recodification, nor an enactment 'without material change,' but was a major restructuring and amendment of Texas venue law, ..."

We hold that such restructuring and amendment of the previous Texas venue law, coupled with the specific provision of § 15.061, concerning joinder of defendants or claims, which designates subchapter B as the mandatory venue subchapter for the purpose of transfer to a mandatory county rendered former subdivision 25 permissive.

■ There is no inconsistency or irreconcilable conflict between the permissive provisions of §§ 15.034 and 15.036 requiring the control of one over the other. The legislature has made them each permissive; thus, there is no reason to make one control the other and each may be given effect.

■ We agree with the following language in *Burlington:*

The mere unchanged wording of the provisions themselves is not sufficient evidence of error. This is particularly true where the legislature designed the statute so the subchapter headings play an important role in the overall statutory scheme. This latter factor when coupled

with the presumption that the legislature would not perform a useless act further buttresses the conclusion that the legislature intended to make the venue provisions for such suits against railroad companies permissive and not mandatory. If such a significant oversight was made, it is for the legislature and not the courts to acknowledge and set it right by amendment.

*Burlington Northern Railroad Co. v. Harvey,* 717 S.W.2d at 377. The railroads' points of error are overruled.

Robert Harlow was employed as a switchman-brakeman and conductor for Southern Pacific. In April, 1982, he sustained injuries when he jumped from the Southern Pacific train, upon which he was working, moments before it collided with a PTRA train. He was 36 years old at the time of the accident. The case was tried before a jury which apportioned fault at 40% to Southern Pacific and 60% to PTRA. The jury found actual damages of $1,643,-545.00 and exemplary damages against PTRA of $150,000.00. Both Southern Pacific and PTRA appeal.

The collision between the two trains occurred on a sharp curve located on a Southern Pacific track, which is called the "H L & P lead." Southern Pacific maintains a control tower at the Sprang Yard in which an operator, employed by Southern Pacific, controls the traffic in the area around the Sprang Yard. Neither the Southern Pacific nor PTRA crews knew that they were heading toward one another at the time of the accident.

■ Both railroad companies complain of the sufficiency of the evidence to support the jury's finding that $400,000.00 would compensate Harlow for his physical impairment in the future. In order for a party to be entitled to submission of physical impairment as a separate compensable element of damages, there must be some evidence that the plaintiff has suffered an additional loss beyond that of lost earning capacity and beyond pain and suffering.

*Baker Marine Corp. v. Herrera,* 704 S.W.2d 58 (Tex.App.—Corpus Christi 1985, writ ref'd n.r.e.); *Browning v. Paiz,* 586 S.W.2d 670 (Tex.Civ.App.—Corpus Christi 1979, writ ref'd n.r.e.); *Green v. Baldree,* 497 S.W.2d 342 (Tex.Civ.App.—Houston [14th Dist.] 1973, no writ). In *Allen v. Whisenhunt,* 603 S.W.2d 242 (Tex.Civ.App. —Houston [14th Dist.] 1980, writ dism'd), the court held that evidence that the plaintiff could no longer mow lawns, play basketball and engage in strenuous tasks either for employment purposes or for his own benefit was sufficient to support an award of $30,000 for future physical impairment. Evidence that the plaintiff had trouble with his leg and back, could no longer drive a truck, mow lawns and walk without assistance was sufficient to uphold an award for physical incapacity in *Browning.*

In considering a "no evidence" or "insufficient evidence" point of error, we will follow the well-established test set forth in *Pool v. Ford Motor Co.,* 715 S.W.2d 629 (Tex.1986); *Dyson v. Olin Corp.,* 692 S.W.2d 456 (Tex.1985); *Glover v. Texas General Indemnity Co.,* 619 S.W.2d 400 (Tex.1981); *Garza v. Alviar,* 395 S.W.2d 821 (Tex.1965); *Allied Finance Co. v. Garza,* 626 S.W.2d 120 (Tex.App.—Corpus Christi 1981, writ ref'd n.r.e.); Calvert, *No Evidence and Insufficient Evidence Points of Error,* 38 Texas L.Rev. 361 (1960).

■ At trial, Harlow's wife testified that he has been depressed because he is unable to work like he used to. She said that as a result of his injuries, he has given up racquetball and the recreational activities he engaged in before the accident. Dr. Richard DeLuca testified by deposition that Harlow will always "have a good five-percent physical impairment and loss of physical function to the whole arm which will manifest itself, not on a clinical examination, but only when exposed to extreme stresses." Donald L. Huddle, an economist, testified that Harlow told him that he can no longer do routine car maintenance

and heavy home repairs. He is still able to do yardwork, but it takes him longer. Dr. Don Baxter testified that during the course of his treatment of Mr. Harlow, the range of motion in his shoulder has improved, but he still suffers pain which he likened to a chronic condition. Appellant has a life expectancy of thirty-six more years. There was testimony that continued use of his arm for any strenuous tasks would aggravate his shoulder. The evidence is sufficient to support the finding. Southern Pacific's second and third points of error and PTRA's fourth and fifth points of error are overruled.

■ Both appellants also complain that the award of $900,000.00 for Harlow's loss of earning capacity in the future is not supported by the evidence. Recovery for lost earning capacity is not based upon actual earnings lost but on the loss of capacity to earn money. *Detar Hospital, Inc. v. Estrada*, 694 S.W.2d 359 (Tex.App. —Corpus Christi 1985, no writ). The true measure of this damage is loss of earning power or earning capacity in the future directly resulting from the injuries which have been sustained. *Id.* at 363; *Dallas Railway & Terminal Co. v. Guthrie*, 146 Tex. 585, 210 S.W.2d 550 (1948).

Testimony presented at trial showed that Harlow sustained a serious injury to his right shoulder when he jumped from the Southern Pacific train to avoid being on board when the train collided with the PTRA train. He was out of work for more than a year, underwent two surgeries and still suffers from a chronic problem with his shoulder. Harlow testified that he has a high school education. He went to work for Southern Pacific in 1972 as a switchman-brakeman and conductor and was still with Southern Pacific at the time of trial. As a brakeman, his duties included setting handbrakes, aligning switches, and aligning drawbars and coupling mechanisms. Harlow described the work as strenuous physical labor which requires a great deal of upper body strength. He testified that since he returned to work in 1983, he has

worked an average of two or three days per week. He said that he is incapable of working in bad weather and has difficulty getting off moving equipment. He said that he has made every effort to continue his work as a brakeman, but he simply can't do it anymore.

Dr. Baxter testified that in his opinion, Harlow should be trained for a job in which he would not have to repeatedly use his arm over his head or strenuously use his right arm. He said that if his railroad job requires that he do physically demanding things with his shoulder, he should not do the job.

Dr. DeLuca testified that in his opinion Harlow suffers from "thoracic outlet syndrome," which is related to the accident. DeLuca opined that conservative management of the problem, including therapy, would result in a forty to fifty percent probability of Harlow's symptoms resolving in four to six weeks. If surgery was necessary, the success rate would be greater than ninety percent. DeLuca felt that Harlow would have discomfort and residual impairment in extreme circumstances.

Carl Hanson, a vocational rehabilitation expert called by Southern Pacific, testified that he would not recommend that Harlow leave the railroad because he would likely have an opportunity to hold a conductor's job in the future, which he believed Harlow could handle with his physical limitations.

■ Dr. Huddle, an economist, testified that the past and future wage earning capacity would be either $1,617,160.00 or $1,989,778.00 depending on whether the Department of Labor tables were used or normal retirement age was considered, if Harlow left the railroad and got a full-time job elsewhere making $5.00 per hour. He also testified that if Harlow had continued to work for the railroad at the same level he did in 1985, the present value of his future losses would be either $824,787.00 or $965,788.00. There was sufficient evidence before the jury to support the award. Southern Pacific's fifth and PTRA's seventh points of error are overruled.

▋ Both PTRA and Southern Pacific argued that the jury's award for loss of earning capacity and physical impairment are excessive and should be remitted. The Supreme Court has recently held that factual sufficiency is the sole remittitur standard for actual damages. *Pope v. Moore*, 711 S.W.2d 622 (Tex.1986). We have already reviewed the evidence supporting the findings and found sufficient evidence to support the damage awards. These points are overruled.

By its second and third points of error, PTRA complains of the jury's findings that its conduct constituted gross negligence and the jury's award of exemplary damages. PTRA does not complain of the amount of the award.

▋ In determining whether there is gross negligence, the same no evidence test previously set forth should apply. *Burk Royalty Co. v. Walls*, 616 S.W.2d 911 (Tex. 1981). If the jury finds gross negligence, the defendant has the burden of establishing that there is no evidence to support the finding. *Id.* at 920–21. In determining whether there is some evidence of the jury's finding of gross negligence, the reviewing court must look at all of the surrounding facts, circumstances and conditions, not just individual elements or facts. *Id.* at 922. Texas courts define "gross negligence" as that entire want of care which would raise the belief that the act or omission complained of was the result of a conscious indifference to the rights or welfare of the person or persons to be affected by it. *Id.* at 920; *Ford Motor Co. v. Nowak*, 638 S.W.2d 582 (Tex.App.—Corpus Christi 1982, writ ref'd n.r.e.).

The defendant's state of mind distinguishes gross negligence from negligence. State of mind may be inferred from the defendant's actions. *Williams v. Steves Industries, Inc.*, 699 S.W.2d 570 (Tex.1985). In *Williams*, the Court described the test for gross negligence as both objective and subjective. A plaintiff may prove gross negligence by proving that the defendant had actual subjective knowledge that his conduct created an extreme degree of risk. A plaintiff may objectively prove a defendant's gross negligence by proving that under the surrounding circumstances a reasonable person would have realized that his conduct created an extreme degree of risk to the safety of others. *Id.* at 573. "Conscious indifference" as defined by the Supreme Court, denotes a decision, in the face of impending harm to another party to not care about the consequences of the act which may ultimately lead to that harm. *Id.*

▋ Punitive damages may be awarded against a corporation or principal because of an act of an agent if (a) the principal authorized the doing and the manner of the act, or (b) the agent was unfit and the principal was reckless in employing him, or (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or (d) the employer or a manager of the employer ratified or approved the act. *King v. McGuff*, 149 Tex. 432, 234 S.W.2d 403, 405 (1950); *Missouri Pacific Railroad v. Dawson*, 662 S.W.2d 740 (Tex. App.—Corpus Christi 1983, writ ref'd n.r. e.).

▋ The term "manager" as applied to a representative of a corporation, implies that the management of the affairs of the company has been committed to him with respect to the enterprise under his charge. *Purvis v. Prattco, Inc.*, 595 S.W.2d 103 (Tex.1980). Such an agent has been defined as an individual to whom the corporation has confided management of a portion of its business with the authority to employ, direct and discharge servants, and engage in non delegable duties. *Delta Drilling Co. v. Cruz*, 707 S.W.2d 660 (Tex. App.—Corpus Christi 1986, writ ref'd n.r. e.); *Missouri Pacific Railroad Co. v. Dawson*, 662 S.W.2d at 744.

The pleadings in this case generally allege negligence on the part of Southern Pacific and PTRA. The negligence issue submitted to the jury was global. It asked whether PTRA was negligent on the occa-

sion in question. Likewise, the gross negligence issue asked the jury to consider only the acts or omissions, if any, that were authorized or ratified by a person in a managerial capacity.

William Roy Smothers, the "hump" conductor, or tower operator, for Southern Pacific at the Sprang Tower, testified that he first talked to the PTRA crew at 11:00 a.m. on the day of the accident. The engine foreman for the PTRA crew requested and received permission from him to get on the lead line. At about 1:00 p.m., the PTRA crew called to let the tower know they were finished. Smothers told the PTRA crew to follow a "hump" engine back which was in the process of pushing cars into the Sprang Yard. Smothers said that he expected to hear from the PTRA crew again at the hump lead switch. According to Smothers, it was railroad practice to stop at the hump lead switch and request permission to cross Highway 225 to get on the HL & P lead line. He testified that the purpose for calling was to warn the switchman of the approaching train in order that he could clear the tracts of any other trains on the HL & P lead line. However, the PTRA crew never told him they were crossing Highway 225 to get on to the HL & P lead. The accident occurred on the HL & P lead line. The trains collided head-on. Smothers testified it was reckless for the PTRA crew to cross Highway 225 without first requesting permission.

Richard Jordan, the superintendent for Southern Pacific at Sprang, agreed with Smothers that the PTRA crew should have gotten permission to cross Highway 225 when they reached the switch point. He stated that the normal procedure was to request permission to cross the highway.

■ PTRA does not contend that it had permission to cross highway 225 or that it requested permission to do so. In fact, Frederick Davidson, superintendent for PTRA, testified that he did not know that Southern Pacific required trains to call at the hump switch before crossing Highway 225. Davidson testified that when the crew calls for clearance at Highway 146, as the PTRA crew did, it gives the crew permission to cross Highway 225 all the way to Pasadena. He felt that communication at the switch was not necessary because there was a Southern Pacific rule to proceed with caution and be prepared to stop short of any obstruction. Davidson said that if a rule did exist which required a crew to notify the tower at the switch, he should have been the one to know about it. He still does not instruct the PTRA crews to notify the tower at the switch. Davidson was the PTRA officer responsible for knowing the procedures for PTRA trains operating on Southern Pacific lines. He was unquestionably in a managerial capacity sufficient to bind the corporation for gross negligence.

■ Negligence may be by omission or commission. Davidson's testimony was that he was unaware of the Southern Pacific policy which required a train to stop at the switch before crossing the highway. He was, however, the individual charged with the responsibility of knowing the PTRA procedure for operation on Southern Pacific lines. The jury could have reasonably found that Davidson was negligent in not learning about Southern Pacific policies.

■ In considering whether the conduct was grossly negligent, we consider all actions or circumstances indicating a state of mind amounting to conscious indifference. *Williams v. Steves Industries*, 699 S.W.2d at 573. Davidson was charged with the responsibility of knowing Southern Pacific policies. In addition, Davidson ratified the actions of the engine foreman who testified that he did not request permission to cross Highway 225. Davidson testified that even though he now knows about the policy, he still does not instruct his crew to stop at Highway 225 and request permission to cross. From this evidence, the jury could have reasonably inferred a conscious indifference to those who use the railways. The jury could have also found that the

failure of Davidson to learn of safety procedures was by itself a grossly negligent act considering the importance of safety on the railroad lines and the probable consequences when the rules of the railroad are not followed. There was sufficient evidence to sustain the jury's findings of gross negligence. PTRA's second and third points of error are overruled.

The judgment of the trial court is AFFIRMED.