TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-00-00440-CV






Mitchel Wong, M.D. and Austin Eye Clinic Association, Appellants



v.



George W. (Willard) Graham, Appellee







FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT


NO. 98-13467, HONORABLE ERNEST C. GARCIA, JUDGE PRESIDING







 Mitchel Wong, M.D., and Austin Eye Clinic Associates appeal a judgment in this
medical negligence case awarding George W. (Willard) Graham more than $700,000 in damages
and prejudgment interest. Appellants challenge the legal and factual sufficiency of the evidence
to support the jury's findings of proximate cause, foreseeability, causation, and damages. 
Appellants also challenge the admission of evidence of an unrelated lawsuit. We will affirm the
judgment.


BACKGROUND



 On October 2, 1997, Wong, a board-certified ophthalmologist and employee of
Austin Eye Clinic Association, performed cataract surgery on Graham's left eye. Though the
surgery was uneventful, the post-operative period was not. Graham, who was seventy-three years
old at time of trial, developed a series of problems culminating in his losing all sensitivity to light
in the eye. His treatment eventually moved to other doctors and culminated with an additional
surgery--the "Gunderson flap" procedure--that he considers disfiguring. The jury found that
appellants' negligence proximately caused the injury(1) to Graham. It assessed damages for physical
pain and mental anguish, disfigurement, physical impairment, and medical care at $200,000 in the
past and $462,500 in the future; prejudgment interest increased the past damages judgment to
$248,690.53.


DISCUSSION


 The disputes on appeal concern Wong's responsibility for Graham's current
condition. Appellants complain about the erroneous admission and misuse of evidence regarding
a lawsuit that Wong filed regarding an unrelated traffic accident. Appellants also contend that
Graham failed to present legally and factually sufficient evidence to prove cause, proximate cause,
foreseeability, and damages. Graham contends Wong caused his damages by not treating him
properly, not making proper notes, and not referring him timely to other physicians. Graham
contends that his loss of vision, disfigurement, and suffering all resulted from Wong's
commissions and omissions.


Evidence of Wong's lawsuit as plaintiff


 We begin by examining appellants' complaint concerning the admission and use of
evidence regarding an unrelated lawsuit. Graham elicited testimony from Wong regarding a
lawsuit he filed against a driver who rear-ended him. Wong concedes that the evidence was
admissible to impeach his credibility; he testified at his deposition that he could not recall being
a plaintiff in non-medical lawsuits even though only three months before the deposition he had
filed the car-wreck suit, claiming that his injuries imperiled his career as a surgeon. Though there
was some discussion outside the presence of the jury regarding the purposes for which this
testimony could be elicited, appellants did not request an instruction limiting the jury's use of the
testimony. Evidence admitted without limitation is before the court for all purposes. Tex. R.
Evid. 105; see Owens-Corning Fiberglas Corp. v. Keeton, 922 S.W.2d 658, 660 (Tex.
App.--Austin 1996, writ denied); Cigna Ins. Co. v. Evans, 847 S.W.2d 417, 421 (Tex.
App.--Texarkana 1993, no writ). By not requesting a limiting instruction, appellants waived any
complaint that the testimony was irrelevant to the issue of damages. See Tex. R. Evid. 105; see
also Birchfield v. Texarkana Memorial Hosp., 747 S.W.2d 361, 365 (Tex. 1987). We find no
reversible error and resolve this issue in favor of Graham.


Sufficiency of the evidence


Standards

 Appellants' remaining three issues concern the legal and factual sufficiency of the
evidence. To review the evidence under a legal insufficiency or no-evidence point, we consider
all the evidence in the light most favorable to the prevailing party, indulging every reasonable
inference in that party's favor. See Associated Indem. Corp. v. CAT Contracting, Inc., 964
S.W.2d 276, 285-86 (Tex. 1998). We will uphold the finding if more than a scintilla of evidence
supports it. See Burroughs Wellcome Co. v. Crye, 907 S.W.2d 497, 499 (Tex. 1995). The
evidence supporting a finding amounts to more than a scintilla if reasonable minds could arrive
at the finding given the facts proved in the particular case. See id. When reviewing the factual
sufficiency of the evidence, we must consider and weigh all the evidence and should set aside the
judgment only if the evidence is so weak or so contrary to the overwhelming weight of the
evidence as to be clearly wrong and unjust. See Cain v. Bain, 709 S.W.2d 175, 176 (Tex. 1986). 
We will not substitute our judgment for that of the trier of fact merely because we might have
reached a different conclusion. See Westech Eng'g, Inc. v. Clearwater Constructors, Inc., 835
S.W.2d 190, 196 (Tex. App.--Austin 1992, no writ).

 Plaintiffs in medical negligence cases must prove: (1) a duty by the physician to
act according to a certain standard; (2) a breach of the applicable standard of care; (3) an injury;
and (4) a causal connection between the breach of care and the injury. Ortiz v. Shah, 905 S.W.2d
609, 610 (Tex. App.--Houston [14th Dist.] 1995, writ denied). To show proximate cause,
plaintiffs must show that the doctor caused the injury and that the injury was foreseeable. Bradley
v. Rogers, 879 S.W.2d 947, 953 (Tex. App.--Houston [14th Dist.] 1994, writ denied). Plaintiffs
must show a "reasonable medical probability" that the defendants proximately caused their injuries;
plaintiffs must show by a preponderance of the evidence that the defendants' negligent act or
omission was a substantial factor in bringing about the harm and without which the harm would
not have occurred. Park Place Hosp. v. Estate of Milo, 909 S.W.2d 508, 511 (Tex. 1995); see
also Bradley, 879 S.W.2d at 953-54. Proof of mere conjecture, speculation, or possibility is
insufficient. Duff v. Yelin, 751 S.W.2d 175, 176 (Tex. 1988). Plaintiffs are not required,
however, to disprove all alternative hypotheses. Bradley, 879 S.W.2d at 954. A possible cause
becomes probable when the absence of other reasonable causal explanations makes the possible
cause more likely than not the cause of the injury. Id.


Summary of treatments

August 27, 1997 Wong removes a pterygium--a growth on the surface of Graham's left eye. 
Wong prescribes an antibiotic steroid eye drop, tapes and patches Graham's
eye. Graham experiences no problem with his vision. Graham's vision in
his left eye improves to 20/50 without correction. His uncorrected vision
in his right eye is 20/60.


 Wong also notes that Graham has cataracts in both eyes and entropion with
trichiasis on his left lower lid; Graham's musculature changed, causing his
eyelashes to rub his eye and irritate it.


September 9, 1997 Graham's cornea has healed from the pterygium removal. Graham still has
trichiasis. After Graham declines to have surgery to correct the condition,
Wong removes the troublesome lashes. They schedule surgery to remove
a cataract from his left eye.


September 30, 1997 Graham has a preoperative visit with Wong. Graham's vision tests at 20/50
in both eyes.


October 2, 1997 Wong removes the cataract from Graham's left eye.


October 3, 1997 At the first post-operative visit, Graham has some corneal edema, corneal
swelling, and decreased vision. He could count fingers only at one foot. 
Wong prescribed a topical steroid for use three times a day. They set an
appointment for cataract removal from the right eye on October 16,
contingent on improvement in the left eye.


October 8, 1997 Graham's eye is slightly improved and the cornea is clearing. Wong
decreases the frequency of the steroid application to twice daily, but cancels
the October 16 surgery.


October 22, 1997 Graham's sight is slightly improved. He can count fingers two feet away. 
His left eye has keratic precipitates with a pupillary membrane, indicating
inflammation in the anterior chamber. Wong notes moderately severe
uveitis, a non-infectious inflammation. Wong concludes that an infection
in the eye, endophthalmitis, is possible, but not probable. To combat the
increased inflammation, Wong increases the frequency of the steroid
application to every waking hour and prescribes an eye-muscle relaxant.


October 27, 1997 Graham's caretaker, Brenda Farrar, calls Wong's office to report that
Graham's eye hurts and is red and draining; she requests something
stronger for the pain. The staff tells Graham to come in as soon as
possible. Wong's son, a board-certified ophthalmologist and Austin Eye
Clinic employee, calls a refill of the eye-drop prescription and leaves a
message for Farrar that she need not bring Graham in for an office visit.


November 4, 1997 Wong examines Graham and notes that Graham's eye had foreign body
sensation, corneal edema, a fibrous pupillary membrane, and hypopyon--an
accumulation of white blood cells in the anterior chamber. Graham could
no longer count fingers, but could detect hand motion. Wong again
discounts the probability of endophthalmitis and concludes that Graham has
sinusitis, for which he prescribes ampicillin. He continues the dosage of
the eye drops and the muscle relaxant.


November 12, 1997 Wong refills prescriptions for ampicillin, eye drops, and muscle relaxants.


November 25, 1997 Graham's vision and condition are essentially unchanged. Wong diagnoses
postoperative uveitis of undetermined etiology.


December 3, 1997 Graham skips an appointment.


December 16, 1997 In addition to the previously noted symptoms, Wong notes keratitis with
corneal deepithelialization. Because topical steroids retard
reepithelialization, Wong reduces eyedrop dosage to four times daily,
continuing the drops to treat the inflammation.


January 13, 1998 Graham's corneal ulcer is infected, the inflammation is worse, and vision
is reduced to light perception only. His pain, redness, and discharge are
worse. Wong refers Graham to Brian Berger, a retinal specialist. Wong
confers by telephone with Berger and faxes him Graham's records.


 Berger examines Graham, performing an ultrasound and an anterior
chamber tap. The ultrasound does not indicate endophthalmitis, nor does
the tap produce a bacterial culture; Berger concludes that endophthalmitis
is very unlikely, and ascribes Graham's symptoms to the corneal ulcer.


January 14, 1998 Graham still has light perception only. Wong diagnoses a corneal ulcer
with hypopyon. This is Graham's final visit to Wong.



Graham sought treatment from other doctors. The corneal ulcer had almost perforated his eye. 
The new doctors eventually performed a Gunderson flap procedure, which involves pulling the
conjunctiva, the mucus layer of the eye, over the cornea. The procedure saved his eye, but not
its vision; Graham has no light perception in his left eye.


Specific contentions of insufficiency

 Appellants submit many reasons that the evidence is legally and factually
insufficient. They argue Graham did not show that they were responsible for his damages; that
is, he did not show reasonable medical probability of proximate causation and foreseeability. 
They also argue that he failed to segregate which damages, if any, resulted from appellants' care. 
They further argue that the evidence does not support the amount of damages awarded.

 Graham's theory of the case is that appellants caused his loss of vision by not
adequately diagnosing and treating his condition. He contends that Wong should have diagnosed
endophthalmitis and treated him or referred him for treatment based on that diagnosis. 
Alternatively he argues that the only possible other cause was uveitis, which Wong failed to
adequately diagnose and treat or refer him for that condition. He contends that his loss of vision
is a foreseeable result of the inadequate treatment. Graham contends that the evidence was legally
and factually sufficient to support every necessary element.

 Causation and foreseeability of loss of light perception. Graham's experts, C.
Bradley Bowman and Richard Ruiz both testified that Graham's loss of vision resulted from
undiagnosed endophthalmitis.(2) They agreed that, following cataract surgery, infection should be
a primary concern, particularly when the post-operative patient shows unexpectedly severe
inflammation or pain. They testified that endophthalmitis must be a leading diagnosis until ruled
out because untreated infections will lead to loss of vision; early treatment is critical. Ruiz
testified that Wong should have taken a culture of Graham's vitreous and injected antibiotics into
his eye on October 22 even before the culture results returned. Ruiz said oral and topical
antibiotics do not get adequate concentrations into the eye. Bowman, Ruiz, and James Everett
Key, II testified that pupillary membranes like Graham developed are mainly or likely caused by
endophthalmitis. They pointed to other signs of infection such as impaired vision and keratic
precipitates--clumps of white blood cells next to the cornea. Bowman testified that by January the
problems at the front of the eye, possibly caused by too lengthy use of steroid eye drops, misled
Berger and precluded him from visually inspecting the back of the eye where the infection was
destroying Graham's vision. Bowman discounts the results of Berger's ultrasound and anterior
eye tap, asserting (with Berger's agreement) that ultrasounds often fail to diagnose endophthalmitis
and that the anterior tap is less likely to show an infection of the vitreous at the back of the eye. 
Berger and Ruiz agreed that suspected endophthalmitis cases cause positive cultures for bacteria
only about half the time; Ruiz said anterior aqueous taps are even less accurate. Berger also
conceded that topical steroids like Graham was using can mask signs of infection for short periods
of time.

 Bowman testified that diagnosing uveitis before ruling out endophthalmitis is below
the standard of care. He testified that uveitis in a post-operative cataract patient would be
extraordinarily coincidental; he also testified that a patient whose eye was as nonresponsive to
uveitis treatment as Graham's eye should have gotten much more extensive testing and treatment
by November. Bowman said that cases in which uveitis led to total vision loss were
extraordinarily rare; neither he nor Wong had seen a patient lose all light perception as a result
of uveitis.

 Bowman and Ruiz were also critical of administrative aspects of Wong's treatment
of Graham. They testified that Wong should have seen Graham more frequently than every two
to three weeks; Ruiz described this frequency as "woefully inadequate." Between the October
surgery and the January referral to Berger, Wong did not perform diagnostic tests, change the eye
drops (other than the frequency of dosage), see Graham more frequently than two week intervals
(though at least one of the gaps was due to Graham's no-show at appointment), call another
doctor, or refer him to another doctor. Bowman and Ruiz testified that Wong's records were
subpar, failing to note complaints of pain. Bowman was particularly bothered by the absence from
the charts of a telephone message taken by Austin Eye Clinic Association staff from Graham's
caretaker requesting more pain medication because Graham was "still" in pain--indicating present
and past pain which Bowman felt was not adequately recorded in the charts. Berger noted that
Graham had a three-day history of pain. Bowman testified that the lack of consistent pain notation
misled Berger into believing that Graham's pain and problems in January arose from the corneal
ulcer.

 Though Graham primarily contends that he suffered from untreated
endophthalmitis, he contends alternatively that Wong did not adequately treat him for uveitis.(3)
Uveitis, however, should respond to topical steroids. Bowman testified that it should have cleared
within three to five days following the October 22 visit when Wong increased the eyedrop dose
to hourly. It did not. Instead, it worsened. Graham's condition was worse than any of the
testifying doctors had seen in a post-operative cataract patient. Nevertheless, Wong did not use
the more aggressive treatments (full work-up, chest x-ray, blood tests, other modes of steroid
delivery, and more frequent examinations) that Bowman testified were the standard of care for
nonresponsive uveitis. Though Wong may have reasonably not given Graham oral steroids
because of the potential side effects, Berger testified that persistent uveitis can be treated with
steroid ointments and steroid injections near the eye to avoid the systemic side effects of oral
steroids. Berger agreed that Graham should have been examined more frequently because he was
not responding to treatment. Ruiz agreed that Wong's treatment of Graham was completely
inadequate if the condition was uveitis. He agreed that uveitis could have caused the vision loss.

 Wong testified he did nothing inappropriate that led to Graham's vision loss. He
concluded that Graham did not have endophthalmitis and diagnosed Graham's highly abnormal
post-operative condition as uveitis; Berger and Key agreed that endophthalmitis was highly
unlikely. Wong treated Graham with steroid eyedrops. He testified that he or his staff would have
written down a complaint of pain had Graham voiced it; in fact, Wong or his staff noted on the
charts more than once that Graham was suffering either pain or foreign body sensation. Berger's
January examination revealed that Graham's eye was "quiet"--it lacked the level of inflammation
consonant with infection of the vitreous. He tapped the anterior part of the eye because that is the
portion in which his examination showed hypopyon (pus). Both the ultrasound and the tap showed
no infection. Key testified that Graham lost his eyesight to persistent uveitis ocular inflammation. 
Key testified that Graham did not respond to any type of therapy so there was no indication
whether more aggressive treatment would have helped. Wong agreed with that assessment,
testifying that ninety-nine percent of patients would have healed from the ulcer; even aggressive
antibiotic treatment did not heal the ulcer until the Gunderson flap procedure.

 There was also evidence that Graham was not the most diligent in obtaining care.
He may not have communicated his complaints clearly. He reported that he did not always
administer the eyedrops with the frequency Wong prescribed. He may have abraded his cornea
with eyelashes or a paper towel. More than once, whether due to transportation difficulties or
other reasons, he prolonged the gap between office visits slightly beyond the three weeks Wong
recommended. 

 Appellants also argue that, if there is blame, perhaps Berger or subsequent treating
doctors should bear at least some of it. Graham could perceive the difference between light and
darkness when Wong referred him to Berger, and yet Graham lost even that perception after the
referral. With the exception of the October phone message regarding pain, Berger had the same
information from Wong that Bowman used in formulating his opinion, yet agreed with Wong's
rejection of endophthalmitis after two examinations of Graham.

 We conclude that legally and factually sufficient evidence support the jury's
findings that appellants proximately caused Graham's total loss of vision and that such loss was
foreseeable. Evidence supported a conclusion that either untreated endophthalmitis or mistreated
uveitis caused Graham's vision loss and that neither a corneal ulcer nor macular degeneration
would result in loss of light perception.

 Wong agreed that "it's more likely than not that [a patient] will lose sight and go
to no light perception in an untreated infection in the eye." Endophthalmitis is a risk following
cataract surgery. Graham exhibited the hallmarks of endophthalmitis from the outset of the post-operative period: pain, inflammation, and decreased vision. There was evidence that appellants'
frequency of examination, diagnosis, charting, and treatment were below the standard of care. 
Though Wong considered infection at every examination, he waited three months before taking
additional steps to rule out infection despite the poor condition of Graham's eye. Graham never
received the intraocular injection of antibiotics--the standard of care for endophthalmitis--that
routinely wipe out almost all bacteria in the eye.

 If Graham's condition was uveitis, evidence supports a finding that appellants' care
was inadequate; despite Graham's nonresponsiveness to treatment, appellants neither significantly
altered his treatment nor increased the frequency of examination. There also was evidence that
Wong's charts did not include all the necessary elements and that a telephoned complaint of
persistent pain was not included in the information transmitted to Berger.

 Though Graham may have had some light perception when referred to Berger, there
was evidence that Graham's corneal ulcer (which evidence supports finding was caused or
worsened by the long-term use of steroid eyedrops), coupled with Wong's spotty charting, led
Berger to focus on the ulcer. Evidence supports a finding that the severity of the ulcer left
subsequent doctors with no reasonable choice but to perform the Gunderson flap.

 More than a scintilla of evidence supports the findings that Graham's loss of vision
was foreseeable and was proximately caused by appellants' actions and omissions; the evidence
is not so weak or so contrary to the overwhelming weight of the evidence as to be clearly wrong
and unjust. The existence of expert testimony controverting other expert testimony presents a
choice for the jury to make, but does not require reversal.

 Causation and foreseeability of disfigurement. Similarly, sufficient evidence
supports findings that Graham's disfigurement was foreseeable and proximately caused by Wong's
treatment of the ulcer. The disfigurement is a result of the deteriorated condition of the eye and
the Gunderson flap procedure. Wong first noted deepithelialization on December 16. He reduced
the frequency of use of topical steroid eyedrops from hourly to four times daily. Records from
a January 21 examination show that an abrasion on the cornea came from wiping with a paper
towel. Though admitting that an eye ulcer could potentially progress exactly as Graham's had
with proper treatment, Bowman testified that Wong's treatment of the ulcer probably led to the
disfiguring surgery. Bowman testified that "the continued use of steroids without appropriate
antibiotic treatment could have caused and probably caused this ulcer to become worse because
it wasn't treated appropriately." (Emphasis added.) Berger agreed that hourly application of
steroid eyedrops foreseeably increases the risk of a corneal ulcer. Ruiz testified that continuing
the use of the topical steroids after finding the ulcer made it worse. He and Bowman said that the
standard of care required taking a culture of the eye, stopping the steroid eye drop, and starting
an antibiotic eyedrop--none of which Wong did. The steroids would cause the eye surface to thin
to near perforation. The dramatic thinning of the eye caused the subsequent doctors to perform
the Gunderson flap procedure to save the eye, resulting in the disfigurement about which Graham
complains. Legally and factually sufficient evidence supports the conclusion that appellants
foreseeably and proximately caused the disfigurement.

 Damages. Appellants' remaining issues concern damages. Appellants contend that
insufficient evidence supported a link between their conduct and Graham's loss of vision and
damages. They also contend that insufficient evidence supports the amount of damages. We first
will examine the sufficiency of the link between appellants' treatment and the damages awarded
to Graham.

 Segregation. Appellants first complain that Graham failed to segregate the damages
caused by appellants from damages caused by other persons and other factors. The damage award
was made in response to a broad-form question asking for a single sum to compensate for physical
pain and mental anguish, disfigurement, physical impairment, and medical care; the question
requested separate amounts for past damages and future damages. Appellants complain about the
proof of the damages, not the form of the question.(4)

 A plaintiff must prove that the negligent actions for which the plaintiff sues
necessitated the medical expenses for which the plaintiff seeks recovery. Texarkana Memorial
Hosp., Inc. v. Murdock, 946 S.W.2d 836, 840-41 (Tex. 1997). In Murdock, an infant died after
months of treatments for multiple problems--some present at birth and some caused by hospital
malpractice. Id. at 837. The jury awarded $250,000 to the decedent's estate (not appealed) and
$500,000 to the decedent's mother for medical expenses out of a total bill of $748,710.44. Id. 
The supreme court held that the court of appeals could not properly have held the jury's award was
supported by factually sufficient evidence because the plaintiffs had not introduced evidence about
which treatments addressed the malpractice-induced condition; the supreme court rejected the
argument that the jury's paring of the requested award showed they deducted charges for
treatments not resulting from the negligence. Id. at 840. The supreme court held that a plaintiff
must provide expert medical testimony to explain what medical procedures treated the negligently
created condition. Id. at 841. The court wrote that medical expenses were susceptible to such
detailed proof, unlike "nebulous measures of damages such as pain and suffering where the jury
has broad discretion when fixing an amount to award." Id.

 A significant distinction between Murdock and this appeal is the nature of the
damages challenged. The Murdock appeal concerned only the medical expenses award, but
medical expenses in this case were at most $10,545.74(5) of the $200,000 past damage award. This
damage award is thus much less susceptible of quantification than the award in Murdock.

 Another distinction is that the contribution from sources of injury other than the
defendants' negligence is less than in Murdock. In that case, the decedent suffered from many
congenital problems besides those arising from the hospital's negligence. The medical expenses
could be divided between the treatments for the negligence-induced condition and the congenital
problems. Here, all damages flow from the disfigurement of and loss of light perception in
Graham's left eye. We have concluded above that sufficient evidence supports a finding that
inadequacies in appellants' treatment of Graham, their monitoring of his condition, and their
charting of his progress was a cause of both injuries. That finding was not overwhelmed by
evidence regarding other possible sources of injury such as Graham's poor healing ability, Graham
scratching his cornea with a tissue, macular degeneration, and treatment by other doctors. All
these had countervailing considerations. Testimony that Graham was a bad healer was blunted by
the lack of more aggressive or different treatments in the early stages; the only certainty is that
Graham did not respond well to the treatments given. Regardless of the ulcer's cause, there was
evidence that treatment of the eye's problems (particularly the continued use of steroid eye drops)
prevented healing of the ulcer. The only evidence of macular degeneration in his left eye was that
he had it in his right eye (the ramifications of that for his left eye were disputed); macular
degeneration undisputedly had not robbed and would not rob Graham of light perception in his
right eye. Though Graham might have recovered some sight when referred to other doctors, there
is evidence that appellants' previous treatment of Graham and charting inadequacies frustrated that
possibility. Thus, the jury reasonably could have found that all of the measures of Graham's
injuries flowed from appellants' treatment of him.

 Further, if sufficient evidence connects appellants to the injuries, we must presume
that the jury followed its instructions and awarded damages only for injuries caused by appellants'
negligence. See Turner, Collie & Braden, Inc. v. Brook hollow, Inc., 642 S.W.2d 160, 167 (Tex.
1982); see also Phillips v. Phillips, 820 S.W.2d 785, 787, n.2 (Tex. 1991). In Phillips, the
supreme court affirmed an appellate court's rendition of an attorney's fees award in addition to
the actual damages award. The supreme court rejected the defendant's argument that the jury must
have included the attorney's fee award as part of the plaintiff's damages, writing the following:


The trial court properly did not ask the jury to include in its determination of
Martha's actual damages a reasonable fee for legal services necessary to her
prosecution of the case. See Hammonds v. Hammonds, 158 Tex. 516, 313 S.W.2d
603, 605 (1958). We must assume that the jury followed the trial court's
instructions and answered the question put to them. See Turner, Collie & Braden
v. Brookhollow, Inc., 642 S.W.2d 160, 167 (Tex.1982). Given that assumption,
we must conclude that the jury's answer of $300,000 to the trial court's question
did not include attorney fees.


Harry argues that, logically, the jury must have arrived at their $300,000 finding
by adding $37,585 accounting fees which Martha testified she incurred to the
stipulated $250,000 in attorney fees. However plausible Harry's explanation of the
jury's reasoning process may be, it cannot substitute for the jury's finding. What
the jury found, not why the jury found it, is the relevant inquiry absent jury
misconduct. First Nat'l Bank v. Zimmerman, 442 S.W.2d 674, 678 (Tex.1969). 


Id. Here, the jury was asked first if appellants' negligence caused Graham's injury, then what sum
of money would fairly compensate Graham for injuries that resulted from the occurrence in
question. If sufficient evidence supports the award, we must presume that the jury followed the
court's instructions and excluded damages, if any, caused by other sources.

 Elements of damages. We will examine the evidence regarding the elements of the
damage award: disfigurement, impairment, physical pain and mental anguish, and medical care.

 Sufficient evidence supports an award for disfigurement. Disfigurement is that
which impairs or injures the beauty, symmetry, or appearance of a person by rendering him
unsightly, misshapen, imperfect, or deformed. See Transit Management Co. v. Sanchez, 886
S.W.2d 823, 826 (Tex. App.--San Antonio 1994, no writ). The damages compensate for the
suffering, including humiliation, induced in the mind of the injured party by contemplating his
changed physical condition. See Houston Lighting & Power v. Reed, 365 S.W.2d 26, 30 (Tex.
Civ. App.--Houston 1963, writ ref'd n.r.e.). As discussed above, during appellants' three months
of treatment, Graham's eye was inflamed and oozing pus; sufficient evidence showed appellants'
treatments were inadequate. Now, the eye is dim and somewhat shriveled. Appellants argue that
they did not perform the Gunderson flap that permanently altered his eye, and point to Graham's
deposition testimony that his feelings had not changed since the surgery. As discussed above,
however, evidence supports a finding that the Gunderson flap procedure was the inexorable result
of appellants' negligence--the other option was rupture of the eye. One of Graham's caretakers
said that Graham's remarkably blue eyes were his one source of vanity, and that now he is
embarrassed for anyone to see his eye because he thinks he looks like a rooster pecked out his eye. 
In trial, he described his eye as disgraceful. Further, the jury saw Graham's eye for eight days
and could judge for itself whether the eye was disfigured.

 Sufficient evidence showed that Graham's loss of vision and disfigurement
constricted his range of activities. Damages for impairment may be awarded for restriction of
activities, but the limitation must be distinct from other damage measures such as pain and lost
income; examples include limitations on the ability to mow lawns, engage in strenuous tasks,
drive, walk without assistance, perform routine car maintenance, or play recreational sports. 
Southern Pacific Transp. Co. v. Harlow, 729 S.W.2d 946, 950 (Tex. App.--Corpus Christi 1987,
writ denied). Appellants argue that Graham's activities were curtailed before the surgery, pointing
to the fact that his mother willed her property to some younger people on condition that they care
for him for his life. They also note Graham's continued ability to cook and clean inside his home
as evidence that he is not impaired. There was evidence, however, that the loss of vision has
limited his activities. Before his surgery, he played the fiddle, changed watch batteries, cleaned
up his yard, took trash to a dump, mowed, repaired lawnmowers and a tractor, and fed cattle. He
drove himself five miles to Marble Falls and ran errands; for longer trips, he depended on others
even before the surgery. He hunted, plowed and cut a field of maize, helped install a deer fence,
walked the ranch to find newborn calves, and walked to visit friends; all of this involved walking
over uneven ground. Now, however, his lack of depth perception and vision severely limits his
activities. He no longer plays the fiddle because he cannot see adequately to string it. He has
trouble getting around in unfamiliar places. He loses his balance and falls, so he is extremely
reluctant to go outside his home. He no longer helps with outside chores or drives himself
anywhere. Sufficient evidence supports an award for impairment.

 Sufficient evidence also supports Graham's complaints of pain. Though he had
days without pain during his treatment by appellants, his eye was inflamed for more than three
months. Graham also complained of a dull ache behind his eye. It eventually oozed pus. The
lack of improvement and deterioration of his condition have been linked to appellants' treatment
of him. Wong prescribed pain medications in addition to over-the-counter pain medications. Loss
of depth perception from his loss of vision caused him to fall and suffer scrapes and bruises. 
During trial, Graham showed an injury from such a fall.

 Sufficient evidence also supports Graham's claims of mental anguish. To sustain
such a claim, the record must contain evidence of substantial disruption of daily routine or a high
degree of mental pain and distress that is more than mere worry, anxiety, vexation,
embarrassment, or anger. Parkway Co. v. Woodruff, 901 S.W.2d 434, 444 (Tex. 1995). 
Appellants tout Graham's deposition testimony that nothing about his feelings or mental health had
changed. At trial, however, he testified that his eye's condition ruined his life. Others testified
that he seemed depressed. One of his caretakers testified that Graham said she might as well
knock him over the head, that his life was over because he could not see. This experience makes
him fearful of medical care in general, and adamant against surgery to treat the cataract in his right
eye. He is afraid to walk outside and does not like people to see his eye despite reassurances that
the eye is not repulsive. That fear and embarrassment play roles in the restriction of his activity
shows his confinement has a mental component. Though some of the evidence advanced by
Graham (i.e., worries about being sent to a nursing home if something happened to his caretakers)
may not be severe enough or tied closely enough to these injuries to be compensable, anxiety and
depression that leave a previously active man essentially homebound, embarrassed to be seen in
public, fearful of medical treatment, and opining that his life is over show a substantial disruption
of his daily routine and a high degree of mental strain.

 Appellants' challenge to the evidence of medical expenses is somewhat different. 
The district court admitted Graham's evidence of his medical bills based on Bowman's testimony
that the charges were reasonable and necessary. Appellants contended that some of the charges
were neither reasonable nor necessary because Medicare paid reduced charges and appellants could
not collect the difference from anyone; thus, they argued, Graham cannot recover that which was
never paid. The district court refused to admit appellants' evidence of the reduced Medicare
payments, but allowed appellants to make an offer of proof. On appeal, appellants challenge, not
the exclusion of their evidence, but the reasonableness and necessity of the expenses awarded.

 Evidence of the Medicare payments and reductions are a collateral source of
payment, one that the court did not have to admit. The collateral source rule is a long-standing
tenet of Texas law that the defendant should not get the benefit of payment arrangements that
might reduce or eliminate plaintiff's out-of-pocket expenses. See City of Fort Worth v. Barlow,
313 S.W.2d 906, 911 (Tex. Civ. App.--Fort Worth 1958, writ ref'd n.r.e.) (medical expense
award not reduced by plaintiff's option to receive cheaper or free care in veterans hospital); see
also Texas & Pacific Ry. Co. v. Levi & Bro., 59 Tex. 674, 676 (1883) (damages not offset by
plaintiff's insurance compensation); Century Papers, Inc. v. Perrino, 551 S.W.2d 507, 511 (Tex.
Civ. App.--Texarkana 1977, writ ref'd n.r.e.) (wrongful discharge damages not reduced by
unemployment benefits).(6) Thus, if the treatment and charges are reasonable and necessary to treat
the patient, recovery is permitted regardless of what was actually paid or will be paid for the
service.

 Bowman's testimony that the charges were reasonable and necessary was
uncontroverted. As discussed above, evidence supports a finding that Graham's post-operative
condition was worsened by inadequate medical care, prompting these medical expenses. Even if
Graham caused the initial scratch of his cornea, sufficient evidence supports finding that
appellants' treatment exacerbated the injury.

 Damage totals. The jury has wide latitude in determining the amount of a personal
injury damage award. Baptist Memorial Hosp. Sys. v. Smith, 822 S.W.2d 67, 78 (Tex. App.--San
Antonio 1991, writ denied). Matters of pain and suffering are speculative and not subject to
precise mathematical calculations; determining those amounts is particularly within the province
of the jury. Lee v. Huntsville Livestock Servs., Inc., 934 S.W.2d 158, 160-61 (Tex.
App.--Houston [14th Dist.] 1996, no writ); Mercy Hosp. v. Rios, 776 S.W.2d 626, 636 (Tex.
App.--San Antonio 1989, writ denied). In determining future medical expenses, the jury has wide 
discretion to consider the nature of the injury, the medical care rendered in the past, and the
condition of the injured party at the time of the trial. Southwest Texas Coors, Inc. v. Morales, 948
S.W.2d 948, 952 (Tex. App.--San Antonio 1997, no writ).

 We perceive no basis on which we can overturn or reduce the $200,000 award for
past damages. As discussed above, almost ninety percent (and perhaps more) of the past damages
award was intended to compensate for physical pain and mental anguish, disfigurement, physical
impairment--damages deemed "nebulous" by the supreme court in Murdock. See 946 S.W.2d at
841. Graham suffered pain during treatment and continues to injure himself because of the result
of that treatment. He was and remains disfigured. His activities were restricted by both his
impairment and the mental anguish associated with it.

 Nor do we perceive a basis on which we can overturn or reduce the $462,500 award
for future damages. Though Graham may not suffer as much pain and medical expenses in the
future as a result of his treatment by appellants, his impairment and disfigurement will continue,
as will his resulting mental anguish. Appellants' suggestion that he could possibly get a cornea
transplant at most shifts the damages. Assuming appellant overcame his dread of medical
procedures caused by his previous treatment, the transplant definitely would increase his future
medical expenses and would decrease his other damages only if the procedure worked; and some
witnesses doubted that the vision in or appearance of Graham's left eye could ever be improved. 
Graham's statistical life expectancy at time of trial was 10.4 years, but his mother lived eighteen
years beyond his age at trial. Using those measures as the range, the jury's award for future
damages amounts to between roughly $25,700 per year for eighteen years and $44,500 for ten
years. We do not find this award without support or overwhelmed by opposing evidence.

CONCLUSION



 Both sides in this case presented evidence that could support a verdict in their favor. 
Resolution of such evidentiary clashes is the province of the jury, subject to reversal only if the
appellate court determines that the jury's findings either are supported by no evidence or are
against the great weight and preponderance of the evidence. Having resolved all issues in favor
of Graham, we affirm the judgment of the district court.



 

 J. Woodfin Jones, Justice

Before Justices Kidd, Yeakel and Jones*

Affirmed

Filed: February 15, 2001

Do Not Publish









* Before J. Woodfin Jones, Justice (former), Third Court of Appeals, sitting by assignment. See
Tex. Gov't Code Ann. § 75.003(a)(1) (West 1998).

1. The jury charge does not specify what injury (blindness or disfigurement).
2. Both Ruiz and Bowman are board certified ophthalmologists. Ruiz holds a chair in
ophthalmology at the University of Texas Medical School in Houston. He subspecializes in
retinas. He has seen fifty cases of endophthalmitis. Bowman is an examiner for the
ophthalmology certification board. He subspecializes in corneal diseases and has treated about
seventy patients with endophthalmitis. Only Ruiz examined Graham, and that was after the
Gunderson flap procedure.
3. Wong contends in his reply brief that Graham raises this alternative theory for the first time
on appeal. Graham's third amended petition alleges that Wong "failed to properly diagnose or
treat Plaintiff's condition" without specifying what condition. At trial, Graham's attorneys
interrogated witnesses regarding the adequacy of Wong's treatment of uveitis. In closing
arguments, Graham's attorneys discussed whether Wong adequately treated uveitis.
4. Not only did appellants not object to the submitted question, they proposed a question with
the same lump-sum format (though their request for additional directions preceding the question
was rejected).
5. Whether Graham can recover that full amount is a separate issue on appeal.
6. Appellants concede that no Texas court has held in a published opinion that Medicare
payments are excluded from the collateral source rule. They cite Louisiana cases as persuasive
authority for that proposition. See Suhor v. Lagasse, 770 So.2d 422 (La. Ct. App. 4th Cir. 2000);
Terrell v. Nanda, 759 So. 2d 1026, 1030-31 (La. Ct. App. 2d Cir. 2000) (addressing Medicaid). 
Even if we were persuaded to carve out an exception for past medical expenses, the absence of
certainty that Medicare or Medicaid will cover future expenses would, in our view, limit the
exception's scope to past medical expenses.


s intended to compensate for physical pain and mental anguish, disfigurement, physical
impairment--damages deemed "nebulous" by the supreme court in Murdock. See 946 S.W.2d at
841. Graham suffered pain during treatment and continues to injure himself because of the result
of that treatment. He was and remains disfigured. His activities were restricted by both his
impairment and the mental anguish associated with it.

 Nor do we perceive a basis on which we can overturn or reduce the $462,500 award
for future damages. Though Graham may not suffer as much pain and medical expenses in the
future as a result of his treatment by appellants, his impairment and disfigurement will continue,
as will his resulting mental anguish. Appellants' suggestion that he could possibly get a cornea
transplant at most shifts the damages. Assuming appellant overcame his dread of medical
procedures caused by his previous treatment, the transplant definitely would increase his future
medical expenses and would decrease his other damages only if the procedure worked; and some
witnesses doubted that the vision in or appearance of Graham's left eye could ever be improved. 
Graham's statistical life expectancy at time of trial was 10.4 years, but his mother lived eighteen
years beyond his age at trial. Using those measures as the range, the jury's award for future
damages amounts to between roughly $25,700 per year for eighteen years and $44,500 for ten
years. We do not find this award without support or overwhelmed by opposing evidence.

CONCLUSION



 Both sides in this case presented evidence that could support a verdict in their favor. 
Resolution of such evidentiary clashes is the province of the jury, subject to reversal only if the
appellate court determines that the jury's findings either are supported by no evidence or are
against the great weight and preponderance of the evidence. Having resolved all issues in favor
of Graham, we